GUGGENHEIM v. HELVERING, Com'r of Internal Revenue.

No. 15.

Circuit Court of Appeals, Second Circuit.

Feb. 5, 1941.

Montgomery B. Angell, of New York City, for petitioner.

Carlton Fox, Sp. Asst. to Atty. Gen., for respondent.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

L. HAND, Circuit Judge.

This appeal is from an order of the Board of Tax Appeals assessing a deficiency in the estate tax due from the petitioner, as executrix of Daniel Guggenheim; the questions raised are of two kinds: (1) The proper value of items concededly includable in the gross estate; (2) whether certain items should be included at all. The first and most important of these is the proper value of the decedent's interest in what is described as the "Old Firm." The other questions are (1) the value of his interest in the "New Firm"; (2) the inclusion in his estate of some collateral held by the "Old Firm" against his obligations; and (3) the inclusion of the corpus of a trust fund. The Board made very elaborate findings of fact and wrote a long and careful opinion (39 B.T.A. 251); later supplemented by another, confined to the trust estate (40 B.T.A. 181). We shall assume familiarity with the facts as there stated and shall restate them only so far as is necessary to make the discussion intelligible.

The decedent at the time of his death, September 28, 1930, was a member of two partnerships, called the "Old Firm" and the "New Firm," each composed chiefly though not altogether of members of his family. The "New Firm" had been formed on June 26, 1925; it was composed of four Guggenheim brothers and two outsiders and to it the "Old Firm" transferred some of its assets. The "Old Firm" was formed in 1916; the original partners were five Guggenheim brothers, the decedent's son, his nephew, and one outsider; before September 28, 1930, one of the brothers had died, the two sons had retired—though they retained interests in the assets—and the outsider was completely out. By the agreement of separation the "Old Firm" was to confine itself to ventures already on foot on January 1, 1925, although these were not to be wound up but to be pressed to a conclusion. In the original articles the partners had agreed that any retiring or dying partner should have an option to keep his share in any of the enterprises under way when he retired or died, upon condition that he or his estate should reimburse the remaining partners for any future outlays made to carry them out. The occasion and extent of these calls upon him was absolutely within the discretion of the remaining partners, as was the general conduct and duration of the business. This provision was later changed so that the dying or retiring partner had no option to withdraw, but was obliged to leave his interest in the firm and to make all payments demanded, as though he had exercised his option under the original articles; and so the articles stood on September 28, 1930. Moreover, an ex-partner could withdraw no part of his share until the last venture had been completely wound up in which he was interested. When the two sons retired in 1923 a separate agreement was made by which the remaining partners agreed on their behalf to finance the sons' interests in any undertakings then pending, but the father of each agreed to bear that part of his son's debit which the son's share should not be able to meet.

Although the partners had originally been engaged in the exploitation of copper mines, they had acquired holdings of Chilean nitrates as far back as 1916, and after they had closed out the copper business in 1923 a report in that year of one of their engineers which disclosed a newly discovered method of treating nitrate ores awakened an increased interest in that business. The firm secured patents on this

process and in December, 1924, organized a corporation, called the Anglo-Chilean Company, to exploit it. This company's assets, acquired in one way or another, were large nitrate beds, a non-exclusive license in the patents and about $6,000,000 of promised cash. For these it gave $10,-000,000 of preferred shares and 1,600,000 common shares without par value. Later the preferred shares were redeemed by issuing bonds, and a railway was bought for a second issue of bonds. In 1929 it also acquired control of another nitrate company called Lautaro Ltd. through financing not necessary to describe; this company owned large nitrate beds and some plants operated by the old extraction processes. To acquire the Lautaro properties the Anglo-Chilean company borrowed largely; and at the death of the decedent the unpaid remainder of these loans came to more than $1,900,000, which the "Old Firm" had guaranteed. The Anglo-Chilean company had also borrowed about $10,000,000 in addition which the "Old Firm" had similarly guaranteed; and had also incurred some $25,000,000 on open account, of which the "Old Firm" owned about 55%. The "Old Firm's" interests in the company on September 28, 1930, consisted of that proportion of the accounts and about 666,000 of the common shares.

The Anglo-Chilean company never made any money; it operated at varying deficits during the years 1925-1929 inclusive and for the first six months of 1930, though there was some improvement in 1928 and 1929. The whole industry in Chile had been badly hurt by the competition of synthetic nitrates and was in a most unsatisfactory condition despite the new process; but in January, 1930, Marsh, the company's engineer, made a report suggesting a "reconstruction," which he thought likely to put the company upon a paying basis. The president of the company thereupon opened negotiations with the Chilean Treasury for a consolidation of all nitrate producers into a cartel or monopoly, under government auspices, and by April of that year the outlines of a plan had been agreed upon. The "Old Firm" was willing to go into this scheme and the plan was fully articulated by June; it was proposed that the government should have a half interest in the new venture. The public must have learned of these negotiations and have regarded them hopefully, for the common shares of Anglo-Chilean rose on the New York Curb from about 18 in January to above 30 in June. Obstacles arose in carrying out the original plan—which among other things had involved the assumption by the cartel of all the open accounts of the Anglo-Chilean company—but with some changes these were overcome and the project was finally agreed upon and went into effect in 1931. Meanwhile the decedent had died and at his death the shares had fallen to about 23 on the Curb. The Board found that on September 28, 1930, it was to be expected that the cartel would be organized and that it was still supposed that it would assume all the Anglo-Chilean debts except about $1,900,000. It was part of the plan that the burden of the export excises formerly imposed upon nitrates should be substantially relieved, and that the quota system which had been in force should be done away with; both these changes were considered advantageous to the industry. The cartel was not a success; the industry did not prosper under it; it collapsed by the summer of 1932 and was dissolved at the beginning of the next year.

■ The first challenge to the Board's ruling is that it found $9.40 as the value of the Anglo-Chilean shares on September 28, 1930, and that the open accounts were worth par. The petitioner argues that we should hold that there was no evidence that the shares had any value at all, or that the accounts could have been worth more than fifty cents on the dollar. We do not conceal the difficulty of finding the value of such securities in such quantities; yet people were actually buying and selling the shares freely and in substantial numbers at more than twice the value which the Board found, and it seems to us palpably untrue to say that they could have been worth nothing at all. If one could have looked ahead, the hopes on which such values were based would have been seen to be unfounded; the cartel was not destined to pull Chilean nitrates out of the mire; but there can be no question that at the moment when—unhappily for his estate—the decedent chanced to die, those hopes were shared as well by persons in a position to know the facts as by the general public. What happened later has nothing to do with the case. Ithaca Trust Co. v. United States, 279 U. S. 151, 49 S.Ct. 291, 73 L.Ed. 647. It would have been irrelevant for instance if on September 30, 1930, an earthquake had swallowed every acre of the company's nitrate beds with all its plants. It is true

that in valuing patents for income tax purposes two circuits have taken the opposite view. H. H. Miller Industries v. Commissioner, 6 Cir., 61 F.2d 412; American Chemical Paint Co. v. Commissioner, 3 Cir., 66 F.2d 381. Moreover, in Nachod & United States Signal Co. v. Helvering, 74 F.2d 164, the Sixth Circuit reaffirmed the same doctrine, this time upon the supposed authority of Sinclair Refining Co. v. Jenkins Petroleum Process, 289 U.S. 689, 53 S.Ct. 736, 77 L.Ed. 1449, 88 A.L.R. 496. Nevertheless, with deference, it appears to us that this involved a misunderstanding of the Supreme Court, and that both courts have confused two quite different questions. In Sinclair Refining Co. v. Jenkins Petroleum Process, supra, the court was passing upon the damages suffered by a promisee from the breach of a contract to assign a patent, and held that it was proper to look to what the seller had earned by exploiting it after the breach. There the test was that amount which would put the buyer in as good position as though the seller had performed, and the best way to learn that would have been to wait and see what the patent actually brought in. Estimates of its value are mere makeshifts permissible only because the suit cannot wait so long. There are indeed situations when present value is itself an issue, and that may be true even in contracts; for if the goods are fungibles the law imposes upon the buyer the duty to stop his loss by a covering contract. Estate taxes are another instance of this, because they are assessed upon value at the decedent's death (often with extremely harsh results) and present value is present opinion. Only so far as present opinion is composed in part of a forecast of the future can the future be supposed to have anything to do with it; and it really has none even then, because a forecast of the future is an entirely different thing from the actual future which will confirm or falsify it.

It is quite true that there is no evidence supporting the Board's finding that the value of the shares was precisely $9.40; on the other hand the evidence does not deny that this may have been their value. In the nature of things more definite evidence was not possible; there were no certain indices to which the Board could turn, yet it must select a definite figure. It is enough that we cannot say that the one which it chose was wrong,

for the petitioner has the burden; and if the shares were worth $9.40 it was permissible to find that open accounts were worth their face. These values were however only two of the factors which entered into the value of the decedent's interest in the "Old Firm," and it by no means followed that because they made up all the property of the partnership his interest should be appraised as though he had held outright his aliquot part of the shares and the accounts and could have immediately disposed of them. That is however what the Board did and the next question is whether it was right. While a deceased partner's executors have no interest in the firm assets but only the right to an accounting (N. Y. Partnership Law, Consol.Laws, c. 39, § 51(2) (d), that alone need not inevitably have made much difference if, as is usual, death had here dissolved the "Old Firm" and permitted an immediate liquidation. But the articles were not of the usual kind, as we have seen; a deceased partner's interest must remain in the firm until the survivors chose to close out the last venture on foot when he died, after such further exploitation as they might think expedient. Moreover, not only might they so expose his interest to any future risks that this power involved, but they could call upon his executors to reimburse them for his part of future outlays; the articles gave them in substance an irrevocable power to charge his estate. Any purchaser of the decedent's interest must therefore be able and willing to accept the hazard which this undertaking assumed. Further, there were the existing commitments of the most serious nature, for, again as we have seen, the "Old Firm" had guaranteed $12,000,000 of the Anglo-Chilean accounts and it had advanced upon the share of the decedent's son some $3,500,000 for which his estate stood guarantor. All these liabilities the Board refused to consider because at the values it had found as of September 28, 1930, nothing would be due under them. We cannot agree. First, even though the chance should be disregarded that those values would change, it would certainly have a most serious effect upon the value of the interest that not a cent could be withdrawn until the survivors saw fit to close out the last undertaking. And it was vastly more serious that nobody could buy the interest as he could buy shares or accounts in general; that is without

risking more than what he paid. The buyer of this interest must accept indefinite commitments, determinable at the will of others (in fact they amounted to over $5,000,000) to say nothing of the guarantee of huge existing debts including the son's liability. Entirely to disregard these clogs upon the interest was to disregard perhaps the most vital factors determining the value of the decedent's interest in the "Old Firm." It is true, as the Board said, that the effect of these was uncertain and could not be accurately appraised; neither could the value of the shares and of the accounts themselves. In appraising property of this kind, whatever courts may say, and however they may seek to disguise what they do, it is impossible to avoid some measure of speculation. At times we can indeed fix upper and lower limits with some color of assurance, but it is absurd to assert that any particular figure between them has more objective justification than another; the very action of the Board in selecting $9.40 in the case at bar is a good instance. A judicial duty which is inherently subject to such shortcomings must not stop half way; it is no more speculative to appraise the proper discounts for the delays, the risks and the liabilities involved than to appraise the shares themselves. And of all possible appraisals that alone was sure to be wrong which the Board chose; a doctrine so enamored of accuracy that it must abdicate is the most irrational of all. The law is not so helpless; situations again and again present themselves where, after all shifts are exhausted, rather than permit certain injustice, a tribunal will make the best reckoning that the facts admit though fully conscious of its infirmities. Trials to a jury abound in such instances and custom has long indurated us to them. The Supreme Court has recently recognized the propriety of so proceeding in other connections. Sheldon v. Metro-Goldwyn Pictures Corp., 309 U.S. 390, 60 S.Ct. 681, 84 L.Ed. 825; Palmer v. Connecticut Railway & Lighting Co., 61 S. Ct. 379, 85 L.Ed. ——. In the appraisal of property for taxation courts have also escaped from the same dilemma by allowing themselves the necessary latitude. Helvering v. Taylor, 293 U.S. 507, 55 S.Ct. 287, 79 L.Ed. 623; Cohan v. Commissioner, 2 Cir., 39 F.2d 540; Conrad & Co. v. Commissioner, 1 Cir., 50 F.2d 576; Davison v. Commissioner, 2 Cir., 60 F.2d 50; B. F. Sturtevant Co. v. Commissioner, 1 Cir., 75 F.2d 316, 323, 324. The Board made no allowance for these factors, apparently supposing that the taxpayer was bound to show not only that the deficiency assessed against her was wrong, but by how much. The cases just cited hold the contrary, and so too do Sioux City Stock Yards Co. v. Commissioner, 8 Cir., 59 F.2d 944; Laird v. Commissioner, 3 Cir., 85 F.2d 598, 600, 601; and Clements v. Commissioner, 8 Cir., 88 F.2d 791, 793. The case must be remanded for the reappraisal of the decedent's interest in the "Old Firm" in accordance with the foregoing.

### The Decedent's Interest in the "New Firm".

Only one question arises as to the appraisal of the decedent's interest in the "New Firm," and that depends upon the following facts. In 1930 a new partner, named Howland, was taken into the firm for five years and the articles provided that at the end of that time he might retire and sell his interest for $2,000,000. This he did on January 1, 1935, and the petitioner was compelled to pay the decedent's proportion of this which was $100,000. The Commissioner appraised her interest in the "New Firm" at $167,288.60, and her argument is that he should have subtracted from that figure the greater part of this payment. Specifically she argues, since Howland's interest in the business was only two twenty-fourths as to one class of enterprises—in which the decedent's was five twenty-fourths—and one-tenth as to the other class in which the decedent's was one-fifth—that if the decedent's interest was worth only $167,288.60, Howland's could have been worth no more than $85,000 (she says $50,000). In that event the decedent's share in Howland's interest acquired in 1935 could not have been worth more than $4,000, so that her payment of $100,000 was a loss of more than $95,000 by which the decedent's interest in the "New Firm" should have been reduced. There are two answers to this. First, the decedent's interest in the "New Firm" was appraised more than four years before Howland's interest was valued at $2,000,000 and the two sums are therefore not commensurable. Second, it by no means follows that Howland withdrew or was expected to withdraw each year the full amount which he contributed to the firm assets. His privilege was not a gratuity,

and unless it was his withdrawal should have left the firm no worse off than if he had never joined. Whatever the fact, such at any rate must have been the understanding at the outset and the contract had gone for so small a part of the five years that nobody could reasonably have declared on September 28, 1930, that Howland's connection with the firm would result in a loss. At least it rested upon the petitioner to show that that was true and she did not do so.

### The Collateral for the Son's Obligation.

[8, 9] The decedent had deposited certain shares of stock with the "Old Firm" as collateral for his guaranty of his son's future liability. This collateral was sold and the petitioner asserts that no part of the proceeds which took its place should have been included in the decedent's estate. This extreme position is clearly wrong; it did not follow because it was eventually necessary to use the collateral that that was evident on September 28, 1930. On the other hand, it was improper to include the collateral as though it had not been subject to the pledge. When a decedent has pledged part of his estate upon a debt of his own it is reasonable to include it at its full value because he gets a deduction for the debt, but when he pledges it for the debt of another— even a debt which he has guaranteed— that is not so. The problem is the same in kind as in the case of the decedent's interest in the "Old Firm" itself; and it was necessary to make some allowance for the same chances that infected the decedent's interest in the assets of the "Old Firm." As to this item there must therefore be a reappraisal.

### Inclusion of the Trust Fund.

In 1917 the decedent set up a trust for the benefit of his son Robert and of Robert's children and descendants. Out of the income of this fund Robert was to have annually $21,000 for ten years, at the end of which the trustees were to turn over to Robert the principal and accumulations. In case of his death his children should have the income in equal shares pending minority and for twenty years after Robert's death and then the principal. There were remainders over for the descendants of a child dying within the period. "Children" were limited to the offspring of Robert's first and second marriages—he had then been married a second time and had two sons by the first marriage. The settlor reserved absolute power to "modify or alter in any way or to revoke in whole or in part this agreement" and thereupon to "direct the disposition to be made of the trust fund." In 1922 the decedent changed these provisions; he gave Robert an annual income of $21,000 for life instead of ten years, but provided that Robert's three uncles might allow the whole income—principal was then about a million dollars—or might reduce the allowance to nothing at all, both in their uncontrolled discretion. All income not paid was to accumulate and become part of the corpus which should pass in remainder to Robert's children or grandchildren upon his death. The management of this trust he also devolved upon the three uncles, and he changed the powers reserved to revoke the trusts or to alter the limitations so as to read as appears in the paragraphs appended in the margin. *

---

* "III. The Settlor hereby relinquishes, abandons and divests himself of all powers by the said trust agreement of the 29th day of October, 1917, reserved to or retained by him to revoke the said trust agreement and the trust existing thereunder, and the said trust agreement shall have effect, and the Trustee shall hold title to the trust fund and to the properties, interests and securities comprising the same, and the trust created by the said trust agreement shall be executed and administered as if no power of revocation had ever been reserved to or retained by the Settlor.

"IV. Nothing in this instrument contained shall be deemed to affect or limit the power of the Settlor to modify, alter or correct the provisions of the said trust agreement of the 29th day of October, 1917, provided that any such modification, alteration or correction shall not operate to revoke the said agreement or the trust existing thereunder, or to frustrate the essential purposes of the trust of making provisions for the son of the Settlor and his children or descendants, or to impair the substantial integrity of the trust fund, or to create a beneficial interest in or under the trust, on behalf of the Settlor or any person not previously beneficially interested therein or thereunder. * * * Nor shall anything in this instrument contained be deemed to affect or limit the power of the Settlor, by directions in writing given to the Trustee, to alter, define and prescribe the relative interests of the beneficiaries in the trust fund or the income thereof, their respective shares in the same, their respective powers with

Before September 28, 1930, one of Robert's two children had died and he had married a third wife; the class of his children as defined in the trust was therefore closed, and the only possible beneficiaries were he, his remaining son and the son's future descendants. The question is whether, having cancelled his general power of revocation, the decedent still reserved such powers to himself as brought the corpus of the trust within § 302(d) of the Revenue Act of 1926, 26 U.S.C.A. Int.Rev.Acts, page 228. The petitioner concedes that if he retained power to distribute the principal and interest between Robert and his son as he chose, the Board was right in including the trust fund. In so conceding she is clearly right. Commissioner v. Chase National Bank, 2 Cir., 82 F.2d 157; Holderness v. Commissioner, 4 Cir., 86 F.2d 137; In re Tyler's Estate, 3 Cir., 109 F.2d 421. Thus the issue turns upon an interpretation of the deed.

Had the decedent reserved the power to himself to raise Robert's allowance from $21,000 to the whole income of the trust, or to reduce it "down to no amount of payment at all," the corpus would certainly have been within § 302(d), for he could then have distributed the whole income, i. e. the life interest, between Robert and the remaindermen at his pleasure. The deed of 1922 was curiously drawn, because it started by amending the first article of the original deed so as to give the decedent exactly the power we have described; and it was only by a later provision that this power was vested in the three uncles. The reason for this strange draughting does not appear; but at any rate it resulted that all the decedent had to do to vest complete power of distribution in himself was to cancel the later provision, and leave the first article of the original deed as amended. Or if he had then wished to make sure that his mortmain should have extended over the whole period of Robert's survivorship of himself, he could also have provided for the distribution of the income after his death as he chose. The petitioner's answer to this is that it would "frustrate the essential purposes of the trust" so as to cut down Robert's allowance and accumulate the income for the son or the son's descendants. That is however exactly what the decedent contemplated as a possibility, though the power was lodged in the three uncles, not in himself. To say that a shift of this power of distribution to the decedent himself would frustrate the purposes of the trust would have been unwarranted enough, even if the amended first article had not created precisely such a power; to say so in face of the first article as so amended is absurd. Nor does the concluding clause of the article defining the reserved power, which uses the word "beneficiaries," exclude Robert. The decedent would be "defining" and "prescribing" Robert's "income" whatever change he made in the limitations; there is no ground for saying that Robert was not one of the "beneficiaries."

Order modified in accordance with the foregoing.

---

respect to such shares, and the time and manner of making distribution to the beneficiaries, or any of them, by way of advancement, postponement or otherwise, of principal or income, or both, of the trust fund; which power of the Settlor is hereby expressly reaffirmed and reserved, together with the power of causing a final distribution to be made at any time to or among the beneficiaries, or any of them, and so terminating the trust".