## RICHARDSON v. COMMISSIONER OF INTERNAL REVENUE.

### No. 154.

Circuit Court of Appeals, Second Circuit.
Aug. 17, 1945.

Writ of Certiorari Denied Jan. 28, 1946.
See 66 S.Ct. 490.

HINCKS, District Judge, dissenting in part.

Erwin N. Griswold, of Cambridge, Mass., and Holt S. McKinney, of New York City, for petitioners.

Samuel O. Clark, Jr., Asst. Atty. Gen., and Sewall Key, Helen R. Carloss, and Carlton Fox, Sp. Assts. to Atty. Gen., for respondent.

Before EVANS and CHASE, Circuit Judges, and HINCKS, District Judge.

HINCKS, District Judge.

This is a petition to review a decision of the Tax Court determining certain questions relating to gift taxes assessed against the petitioner.

On December 20, 1935, the petitioner created five trusts, one for each of his five children. In the corpus of each of these trusts was included stock of Vick Chemical, Inc., the aggregate in all of the five corpora being 12,487 shares, and stock of Piedmont Financial Company, Inc., the aggregate in all of the five corpora being 5,100 shares.

The petition here questions the values of these two stocks as found by the Tax Court: it also questions the conclusion of the Tax Court that the petitioner was liable for gift taxes on account of the accumulated income of five trusts created by the petitioner's wife in 1932.

### The Vick Stock

There was undisputed evidence that on the critical date, December 20, 1935, 400 shares of this stock were sold on the New York Stock Exchange, where it had long been listed, at a high of 43 and a low of 42¼. These prices were not out of line with its price on the said Exchange throughout the year straddling the critical date. These prices ranged from a low of 35 in June, 1935, to a high of 46 in February, 1936. For this same year the average monthly volume of sales on the Exchange was about 4,000 shares. There was no evidence of sales exceeding 400 shares on a single day. For the six months preceding the critical date, the price trend was moderately upward.

The valuation placed upon the stock by the Tax Court was $42.625 per share. It cannot be said that this valuation was made without evidence. The bare facts just above recited constitute sufficient evidential support for the valuation. The only open question is whether, as the petitioner maintains, the Tax Court in reaching the indicated result erroneously failed to use correct standards of valuation applicable to the situation which it found.

The chief complaint of the petitioner is that the Tax Court failed to take into account the "blockage" factor: he insists that a block upwards of 12,000 shares which in the aggregate was included in the five gift transfers had a unit value less than $42.625 which was the price at which a small lot of 400 shares was sold on the critical date.

The courts, to be sure, take cognizance of the obvious economic fact that a market in which sales of small lots can be accomplished at a specified price may lack the body and breadth necessary to support sales of large blocks of securities at the same unit price. Helvering v. Safe Deposit & Trust Co. of Baltimore, 4 Cir., 95 F.2d 806; Helvering v. Kimberly, 4 Cir., 97 F.2d 433; Page v. Howell, 5 Cir., 116 F.2d 158. However, the tribunal charged with the task of valuation will not lightly deviate from evidence based on actual sales; only when it is convinced by persuasive evidence that at the critical time the market was such that it could not absorb sales in the larger volume at the price level obtaining for small lots will it conclude that such prices must be discounted in arriving at the fair market value of large blocks. Cf. Gamble v. Commissioner of Internal Revenue, 6 Cir., 101 F.2d 565; Mott v. Commissioner of Internal Revenue, 6 Cir., 139 F.2d 317.

Moreover, in cases in which evidence as to actual sale prices is the dominant or even the exclusive factor relied upon in making a valuation, nothing in the law or common sense requires the trier to attempt to ascertain what the property in question would have fetched at a sale through a sales effort begun and ended on the critical date. Surely the fair market value of, say, a residence is not measured by the price which the owner could have obtained for it on the very day upon which he first decided to sell. Rather, the measure there, as in the case here, is what "a skillful broker could within a reasonable period have realized." Bull v. Smith, 2 Cir., 119 F.2d 490; Mott v. Commissioner, supra.

Here, to be sure, there was some evidence from the plaintiff's experts that the contemporary market would not have supported sales for the large, aggregate block involved in these transfers at the Stock Exchange prices for small lots. But

there was no evidence from such sources that even the large block in question could not have been disposed of at $42.625 within a period reasonably commensurate with the volume of the transaction by brokers or other financial agents competent to accomplish such a hypothetical transaction. In any event, the opinion of the Tax Court makes it plain that such evidence as it had on this issue failed to persuade it that the block in question could not have been sold at $42.625 within a reasonable period after the critical date. This conclusion, although expressed as an "opinion", was essentially a finding in the negative of a subordinate fact. Surely the Tax Court, if not convinced by the evidence, was not obliged to accept the conclusions expressed by the petitioner's experts. Bull v. Smith, supra. Nor are we at liberty to disturb the ultimate finding merely because an independent appraisal of the evidence might have led us to some different finding of the underlying facts and factors.

Several of the Commissioner's witnesses were asked for their opinions as to value based upon the hypothesis that on the critical date the demand to buy as well as the offers to sell had been increased by 12,000 shares. We agree with petitioner's counsel that opinions based on that hypothesis were not relevant. The issue here was as to the existence of such a demand,—or a potential demand which could be aroused by appropriate sales activities. It contributes nothing to a solution to assume the fact which is the main point at issue.

On the other hand, the testimony of the petitioner's experts did not carry far. They were not asked what one skilled in the liquidation of large blocks would have been expected to realize from a liquidation begun on the critical date (when the prior price trend was upward) and prosecuted by the most appropriate methods over the period believed reasonably necessary to accomplish a liquidation on the most favorable terms. Instead, their only expressed opinions were based upon the results to be expected from a liquidation to be accomplished in the last ten days of December either on the New York Stock Exchange in the ordinary routine or through private sales off the Exchange without any specified activity to develop the market for the block. Such testimony even if accepted at its face value might well have failed to convince the trier that the entire block could not have been liquidated at the value found.

We conclude that the petitioner's dissatisfaction with the result reached is plainly traceable to deficiencies in the proofs,—not to the application of erroneous or superseded standards.

### The Piedmont Stock

The Piedmont Financial Company, a Delaware corporation organized in 1925, is an investment company with 100,000 shares of stock outstanding, all of which are owned by thirty-three members of the petitioner's family. Of these shares, 5,100 were included in the five trusts involved in this case.

The securities and other assets of the Piedmont portfolio as of the critical date had a fair market value aggregating $9,808,599.27. There was evidence of accrued income taxes against the corporation and expenses totalling $257,699.20. The resulting difference, $9,550,900, if divided by the number of shares outstanding, would give a quotient of $95.509. This amount was found by the Tax Court to represent not less than the fair market value of the stock.

In its findings the Tax Court included data as to the dividend payments and earnings of the Piedmont stock over a substantial portion of the corporate life. It also included in its findings the corporate balance sheet for the years 1934 to 1936 inclusive. In its opinion the court said that it had considered all this data as also the opinion evidence taken at the trial, and had given due weight "to those factors relevant and pertinent to the determination of the fair market value of this stock," but it failed to specify which factors had been actually applied as having weight and relevance.

The petitioner insists that the result reached demonstrates that the valuation was actually based not on the fair market value of Piedmont stock but on the asset value of the corporation as determined by the market value of the numerous securities and other assets included in its portfolio on the critical date. And the petitioner feels especially aggrieved in that the Tax Court appears to have given no weight whatever to the undisputed testimony of his expert witnesses that the sale of the minority block of the Piedmont stock on or about the critical date would have yielded, if sold, an amount substantially less than the value as found. Here again the petitioner disclaims any quarrel with the findings of fact which have been made; its contention is rather that the court erro-

neously adopted as a criterion of value some theory of intrinsic value as advanced by the respondent's experts rather than that authorized by the applicable regulations.

There is, indeed, substantial color to petitioner's contention. At the hearing the petitioner's experts gave testimony, to us at least highly convincing, to the effect that outsiders could not have been found to buy a minority interest in this family corporation except at a substantial discount from a price based on the asset value of the portfolio. Their conclusion was corroborated by other testimony showing that in respect of a group of comparable corporations there was a substantial differential between the price which could actually be obtained for their stock and a price based on their asset value,—a condition that found some support also in the testimony of the respondent's experts as well. This testimony the Commissioner sought to combat not by opinion evidence to a contrary effect but by expert testimony tending to show that for a minority stock interest in a closely held corporation such as this the applicable criterion of value is not the price at which it could be sold but rather its benefit measured in some other way to its owner. Moreover, in the opinion it was noted that although the portfolio had a definitely ascertainable market value "there was no market for the stock of Piedmont Financial and it was obvious that it is not the purpose of the Richardson family to sell it on the open market."

The opinion of the Tax Judge continued:

"If the arguments of petitioner were to prevail, any cohesive family owning securities having a market value readily ascertainable from trading on the open public market could organize a family holding corporation, transfer to such corporation the securities which it owns, and then deal with the stock of the family corporation on the basis that it has by reason of petitioner's arguments a market value of only approximately half of the market value of the securities owned by such a corporation, thus cutting in two gift taxes and estate taxes which would otherwise be payable on the transfer of the securities themselves.

"We cannot. agree. Closely-held stock of a family holding company which was never sold on the open market and was never intended by the organizers of the corporation to be sold, but was intended to be held by members of the family to evidence their respective beneficial rights in securities which were bought and sold by the corporation and which were dealt in on the open market, can only be valued in any real or practical way *by primarily considering the value of the securities owned* by the corporation. Any other approach would, in our opinion, be futile."

The trial judge made no express ruling upon the applicability of the conflicting views as to the proper standard which had been pressed vigorously at the hearing: he found only that the stock had "a fair market value of not less than $95.509 per share." Nor was there any finding that within a reasonable time through the most suitable commercial channels the stock could have been sold at such a figure.

To me, at least, the findings and opinion when read together strongly suggest that the valuation adopted was based upon some such theory as was enunciated by the respondent's experts whereby the controlling criterion of value for stock such as this was taken to be not its fair market value as provided in the applicable regulations of the Treasury Department but rather some notion of "intrinsic" value. If so, the holding was erroneous. Commissioner of Internal Revenue v. McCann, 2 Cir., 146 F.2d 385; Weber v. Rasquin, 2 Cir., 101 F.2d 62; Laird v. Commissioner of Internal Revenue, 3 Cir., 85 F.2d 598; Worcester County Trust Co. v. Commissioner of Internal Revenue, 1 Cir., 134 F.2d 578. Cf. Guggenheim v. Helvering, 2 Cir., 117 F.2d 469, at page 473.

Feeling that there is at least a substantial doubt as to whether the conclusion is based upon proper standards, I should favor a remand so that the Tax Court might have opportunity to correct the error if one was made or to remove the doubt which exists as to the standard which was actually applied. Commissioner v. McCann, supra. My brothers, however, feel that the finding that the "fair market value" was not less than $95.509 per share sufficiently attests the use of a proper standard and that this court should affirm the valuation as made.

### The 1932 Trusts

In May, 1932, the petitioner's wife executed and delivered five trust instruments. The petitioner was named as the trustee in each. Each named one of the petitioner's five children as a beneficiary; in other respects the trust instruments were identical. Each provided that the trustee should collect the income and until the beneficiary should become twenty-one years of age apply the income or so much thereof as the

trustee should deem advisable to the maintenance, education, or benefit of the beneficiary, any of the income remaining to be "accumulated" and reinvested for the benefit of the beneficiary, with a further provision for the payment over of such accumulations together with the income therefrom to the beneficiary on attaining the age of thirty-five years. Each trust also provided that upon the death of the beneficiary the trust should terminate and the trustee should thereupon pay over "all the principal, and any accumulations not theretofore paid over, to the descendants of the beneficiaries, etc., etc." It was further provided that "all stock dividends, and dividends or cash payments in liquidation received by the trustee" if derived from principal should be added to principal and that all stock dividends and dividends and cash payments in liquidation derived from the accumulations of income for the benefit of the beneficiary be added to such accumulations. And— most important of all for present purposes— each trust instrument provided that the petitioner during his lifetime "may cancel and terminate this agreement by an instrument in writing * * * and upon such termination and cancellation the said H. Smith Richardson shall be entitled to receive the corpus of the trust fund absolutely, and free from all trusts."

In each of these trusts income accrued on the principal which the petitioner treated as accumulations for the benefit of the several beneficiaries as follows: In 1933 in the aggregate amount of $121,125; in 1934 $270,937.50, and in 1935 $106,675. The petitioner paid out for the benefit of the beneficiaries only $150 in 1934, and $900 in 1935. The income thus accumulated for the years 1933-1935 the Commissioner contended constituted gifts from the petitioner to the beneficiaries, and his action including these amounts in a deficiency assessment of the petitioner's gift tax was sustained by the Tax Court. This ruling is now presented for our review.

On December 30, 1941, the petitioner exercised the power conferred upon him under the trust instruments to "cancel and terminate this agreement" and thereupon took over to his personal use the 42,500 shares of Piedmont Financial Company stock which had constituted the original "principal" of the trust set up by the instruments above described. The record, or so much as has been presented to us, does not clearly disclose what eventually happened to the accumulations of income which the petitioner had set aside in the years 1933 to 1935 for the benefit of the beneficiaries. We assume, however, since the argument of both parties proceeds on that basis, that after setting such income aside as "accumulations" for the beneficiaries the petitioner continued to hold the same as trustee under the trust instruments at least until December 30, 1941. What happened to these accumulations thereafter is immaterial for present purposes.

On these facts, the writer is at a loss to understand how these accumulations of income set aside for the beneficiaries in the years 1933-1935 can constitute a completed gift by the petitioner accomplished in 1935, or indeed in any earlier year. Under the trust instruments, the original corpus of each trust is throughout referred to as "principal". Income withheld from the beneficiaries and set aside for their benefit was referred to throughout as "accumulated income" or as "accumulations" and a distinction was made between income accruing from accumulations and income accruing from principal. Against this background, I construe the provision of the trust instruments which gave the petitioner power upon cancellation and termination "to receive the corpus of the trust fund absolutely and free from all trusts", to use the word "corpus" to include the so-called accumulations as well as the original principal. The petitioner's right of capture extended to both alike.

In Richardson v. Commissioner of Internal Revenue, 2 Cir., 121 F.2d 1, this court held with respect to these very trust instruments that the power of cancellation conferred upon this petitioner had the effect of making the income accruing under the trusts taxable against the petitioner for income tax purposes. Since, as I think, the accumulations of income as well as the original principal of the trust were subject to this same power, merely to set aside the accumulations for the time being for the benefit of the beneficiaries would not operate to complete a gift. If, as held in the case cited, the effect of the power of cancellation granted to the petitioner was to constitute him the owner of the corpus for income tax purposes, in my view it was equally effective to constitute him owner for purposes of the gift tax and as long as his right of capture remained alive no taxable gift occurred. The Commissioner cannot have it both ways at once. Cf. Rosenman v. United States, 323 U.S. 658, at page 663,

65 S.Ct. 536. But even under this view, of course, the payments of $900 and $150 were properly subject to the tax.

■ My brothers, however, agree with the Tax Court in its holding that when the petitioner, as trustee, set aside income received by him as "accumulations" for the beneficiaries, he thereby made completed gifts and that his non-exercise of his power by cancellation to reduce such income to his own use free from trust was not a release within the intendment of Section 452(c) of the Revenue Act of 1942, 26 U.S.C.A. Int. Rev.Acts. In other words, they are of the opinion that the failure of the trustee to revoke the trusts resulted in fact in gifts of the annual income to the children, subject to the gift tax; also, such failure to revoke was not a tax exempt release of a power of appointment. Accordingly, the judgment in all respects will be affirmed.