**TRIGON INSURANCE COMPANY (Formerly Blue Cross and Blue Shield of Virginia), Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. CIV. 3:00CV365.**

United States District Court, E.D. Virginia, Richmond Division.

Dec. 17, 2002.

See also, 234 F.Supp.2d 592.

Gilbert E. Schill, Jr., Esquire, McGuire-Woods LLP, Richmond, VA, James D. Bridgeman, Esquire, David J. Curtin, Esquire, Michael J. Desmond, Esquire, McKee Nelson, Washington, DC, for Plaintiff.

M. Hannah Lauck, Esquire, Assistant United States Attorney, United States Attorney's Office, Richmond, VA, Charles P. Hurley, Esquire, Trial Attorney, Tax Division, U.S. Department of Justice, Washington, DC, for Defendant.

## MEMORANDUM OPINION

PAYNE, District Judge.

In this action, Plaintiff, Trigon Insurance Company ("Trigon"), seeks a refund of federal income taxes, plus interest, that

it allegedly overpaid in the years 1989 through 1995. As explained fully in the Memorandum Opinion issued on August 9, 2002 (the "August 9 Opinion"),[1] Trigon and the United States disagreed over the meaning and effect of certain provisions of the Tax Reform Act of 1986 (the "1986 Act").[2] Trigon asserted that certain contracts it had entered into with individual subscribers and health care providers before 1987 were valuable assets, and that, whenever one of these contracts was terminated, Trigon incurred a loss which could have been, but which was not, deducted on its tax returns in the years 1987 through 1995. Trigon failed to include those losses in its annual returns in each of those years, but it subsequently filed amended returns in which it claimed a sizeable refund for the 1989 through 1995 [3] tax years. The United States opposed this refund on several grounds.

For reasons explained fully in the August 9 Opinion, the Court, accepting Trigon's general legal theory, held that contract terminations of the type at issue were eligible losses that, upon proper proof, could qualify for a deduction of the kind claimed by Trigon. However, the August 9 Opinion also held that, as a matter of fact, Trigon had failed to satisfy its burden to prove the value of these terminated contracts, and, therefore, had failed to establish entitlement to the deduction and the refund sought. As a result, judgment was entered in favor of the United States.

Trigon now has moved the Court to alter or amend the judgment pursuant to Fed.R.Civ.P. 59(e), or in the alternative, to order, pursuant to Fed.R.Civ.P. 59(a), a new trial limited to the issue of determining the amount of the refund. For the reasons that follow, Trigon's principal and alternate motions are denied.

## STATEMENT OF FACTS

The August 9 Opinion explains in detail the circumstances giving rise to this dispute, and in the interests of brevity and completeness, that opinion is incorporated here by reference. However, a brief review of the background of this action and the Court's findings relevant to the present motion is necessary.

The company now known as Trigon Insurance Co. is the corporate descendant of two Blue Cross and Blue Shield organizations—Blue Cross/Blue Shield of Virginia (the "Richmond Plan") and Blue Cross/Blue Shield of Southwestern Virginia (the "Roanoke Plan"). Those plans merged in March 1986.

Following the merger, Trigon immediately faced a changed tax landscape because, before 1987, the plans were exempt from federal income taxation, and the 1986 Act eliminated the exemption and subjected the former Blue Cross/Blue Shield organizations to taxation beginning with their first taxable years after December 31, 1986. To facilitate the transition into the new tax regime, Congress enacted a number of transitional rules, including § 1012(c)(3)(A)(ii) of the 1986 Act (the "Fresh Start Basis Rule") which provides that:

> for purposes of determining gain or loss, the adjusted basis of any asset held on the 1st day of such taxable year shall be treated as equal to its fair market value as of such day.

---

**1.** *Trigon Insurance Co. v. United States,* 215 F.Supp.2d 687 (E.D.Va.2002).

**2.** Pub.L. No. 99–514, 100 Stat.2085 (1986), now codified as 26 U.S.C. § 833.

**3.** Trigon could not use the losses on 1987 or 1988 returns, but the losses could be carried forward.

Applying this rule, Trigon's basis in each asset owned on January 1, 1987 (the first day of Trigon's next tax year) was equal to the asset's fair market value on that date. Trigon subsequently determined that among these assets were contracts with its subscribers (Trigon's customers), and contracts with its providers (the doctors and hospitals who agreed to provide service to Trigon customers).

After January 1, 1987, as one might expect, Trigon subscribers and providers terminated some of these contracts. Trigon did not claim these terminations as losses on its tax returns. Trigon, however, eventually determined that it was entitled to claim the terminated contracts as losses, and, on November 16, 1996, Trigon filed amended income tax returns for the years 1987 through 1995 claiming loss deductions for the value of contracts terminated. The IRS denied these deductions, and after an aborted settlement agreement, Trigon filed this action.

In its Complaint, Trigon asserted that the deductions, if accepted, would have resulted in a total refund amount of $61,649,000.[4] Three categories of losses formed the basis for the claimed loss deduction:

(1) The termination, between January 1, 1987 and December 31, 1995, of 15,-998 of the 22,509 group health insurance subscription contracts owned on January 1, 1987, the estimated fair market value of such contracts on January 1, 1987 being $175,147,656;

(2) The termination, between January 1, 1987 and December 31, 1995, of 3,381 of the 9,436 provider contracts with physicians owned on January 1, 1987, the estimated fair market val-

ue of such contracts on January 1, 1987 being $207,896; and

(3) The termination, between January 1, 1987 and December 31, 1995, of its contract with Smyth County Community Hospital, the estimated fair market value of that contract on January 1, 1987 being $36,507.

In essence, Trigon's legal theory was that, on January 1, 1987, Trigon owned intangible assets in the form of health insurance subscriber and provider contracts; each of these contracts had a determinable fair market value on January 1, 1987; some of these contracts were lost by virtue of terminations during the 1987 through 1995 tax years; and the tax deductions for the losses arising from the terminated contracts translate into federal income tax refunds for the 1989 through 1995 tax years.

The United States raised five arguments in opposition to Trigon's theory:

(1) that the stepped-up basis provided by the Fresh Start Basis Rule was not available for tax deductions based on the alleged termination of the contracts at issue;

(2) that Trigon did not establish that the "cancellation, abandonment or termination" of Trigon's contracts constituted a tax deductible loss under the Internal Revenue Code;

(3) that, because there is no market for the individual contracts, no fair market value can be ascertained for the individual contracts;

(4) that each contract is not an individual asset and cannot be valued separately; and

(5) that Trigon did not meet its burden to prove, by a preponderance of the

---

**4.** Shortly before trial, this figure was reduced to $35,188,255, and, at trial, Trigon's tax ex-

pert estimated the refund to be $33,181,966. *See* 215 F.Supp.2d at 694.

evidence, a reliable value for the contracts that form the basis of the loss deduction here at issue.

For the reasons explained fully in the August 9 Opinion, the four legal arguments advanced by the United States were rejected. Nevertheless, having accepted that, in theory, a taxpayer in Trigon's shoes could claim losses from the termination of subscriber and provider contracts, the August 9 Opinion held that Trigon had failed to meet its burden to establish the amount of the claimed deduction because it had failed to prove a reliable value for the contracts, the termination of which was the predicate for the claimed refund. Therefore, judgment was entered in favor of the United States.

In assessing the current motions, it is appropriate to remember how this issue was framed at trial. In an effort to meet its burden, Trigon chiefly relied on the testimony of Michael C. Wierwille, an expert in the valuation of businesses and their assets, to establish the fair market value of the subscriber and provider contracts on January 1, 1987.[5] The United States presented no affirmative valuation evidence of its own, opting instead to attack the credibility of Wierwille's method in general, and the application of that method under the facts of this case.[6]

## DISCUSSION

Rule 59(e) grants aggrieved parties the opportunity to file a motion to alter or amend an adverse judgment, but does not specify the circumstances under which a such a motion is to be granted. The Fourth Circuit recognizes three grounds for amending a judgment: "(1) to accommodate an intervening change in controlling law; (2) to account for new evidence not available at trial; or (3) to correct a clear error of law or prevent manifest injustice." *Hutchinson v. Staton*, 994 F.2d 1076, 1081 (4th Cir.1993).

Rule 59(a) allows for aggrieved parties to file a motion for a new trial as to all or some of the issues in the action, but, like Rule 59(e), does not specify the grounds upon which such a motion is to be granted. The Fourth Circuit has held that a trial court should grant a Rule 59(a) motion where the court "is of the opinion that [1] the verdict is against the clear weight of the evidence, or [2] is based upon evidence which is false, or [3] will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict." *Atlas Food Sys. & Services, Inc. v. Crane Nat'l Vendors, Inc.*, 99 F.3d 587, 594 (4th Cir.1996).

Trigon bases both its principal and alternate motions on the ground that the Court, having found that Trigon theoretically was entitled to claim losses from the termination of its subscriber and provider contracts, made an error of law in failing to estimate the amount of the refund, notwithstanding that Trigon's valuation evidence was found neither credible nor sufficient. Trigon asserts that it met its burden of proving that it was entitled to some deduction, but merely failed to quantify the amount of the deduction. In such circumstances, Trigon argues, the Court has a responsibility to estimate the amount of the claimed deduction; and the failure to do so in this case, Trigon says, constitutes clear error resulting in a manifest injustice within the meaning of Fourth Circuit's jurisprudence as outlined

---

**5.** A tax accounting expert established the quantum of the deduction based on Wierwille's valuation testimony.

**6.** Trigon called another expert to rebut some of the evidence given by the experts presented by the United States and to support some of Wierwille's testimony.

in *Hutchinson* (as to Rule 59(e)) and *Atlas Food* (as to Rule 59(a)).

For the reasons that follow, there is neither error nor injustice in refusing to estimate the amount of the refund that Trigon claimed it was owed, but failed to prove at trial. As explained below, there is no basis for amending the judgment or granting a new trial.

## A. The Nature Of The Taxpayer's Burden In Cases Such As This One

■■■ Although courts employ slightly varied formulations in describing the taxpayer's burden of proof in a refund case such as this, certain aspects of the burden are clear. First, in all actions challenging the United States' assessment of taxes, the assessment of the Commissioner is presumed to be correct. *See Compton v. United States*, 334 F.2d 212, 216 (4th Cir. 1964); *Estate of Andrews v. United States*, 850 F.Supp. 1279, 1289 (E.D.Va.1994). Consequently, in a refund suit, the taxpayer bears the burden of proving either "that no tax at all is owed or that the amount of tax owed is in a lesser amount than that determined by the IRS." *Estate of Andrews*, 850 F.Supp. at 1289. However, "[i]t is not enough for him to demonstrate that the assessment of the tax for which refund is sought was erroneous in some respects." *See United States v. Janis*, 428 U.S. 433, 440, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976). Rather, "[t]he plaintiff, to prevail, must establish the exact amount which she is entitled to recover." *Compton*, 334 F.2d at 216. Stated differently, "the ultimate question in a suit for refund is not whether the Government was wrong, but whether the plaintiff can establish that taxes were in fact overpaid. The plaintiff, to prevail, must establish the exact amount which she is entitled to recover." *Id.* (emphasis supplied).[7]

■■■ The extent of the plaintiff's burden stems from the fact that a refund action is the descendent of the common law action in indebitatus assumpsit. *See Stone v. White*, 301 U.S. 532, 534, 57 S.Ct. 851, 81 L.Ed. 1265 (1937). As the Fourth Circuit explained in *Compton:*

> An action for refund of taxes paid is in the nature of an action of assumpsit for money had and received and the plaintiff's right to recover must be measured by equitable standards. Here, taxpayer's entire liability is at issue and if, under any state of facts, the Government is entitled to the money claimed, she cannot prevail. Consequently, it is not enough merely to show that the assessment was invalid or that the Commissioner erred; the plaintiff must go further and produce evidence from which another and proper determination can be made.

334 F.2d at 216 (citing *Taylor v. Commissioner*, 70 F.2d 619, 620 (2d Cir.1934)) aff'd sub. nom. *Helvering v. Taylor*, 293 U.S. 507, 55 S.Ct. 287, 79 L.Ed. 623 (1935). In *Taylor*, Judge Hand explained the extent of the taxpayer's burden in a refund action as follows:

> If the burden of proof goes so far as to demand not only that the taxpayer show that the deficiency assessed against him is wrong, but what is the proper deficiency, or that there should be none at all, the decision was right, even though we know that the tax is too high. In an action to recover taxes unlawfully collected the burden does go so far ... But the reason for this is obvious; a plaintiff, seeking an affirmative judgment mea-

---

7. The "exact amount" text is not to be taken literally, but instead is subject to the general proviso that claims for refunds, like those for damages, must be supported by evidence proving the claim amount with reasonable specificity.

sured in dollars, must prove how much is due. His claim is for money paid and he must show that every dollar he recovers is unjustly withheld. So it is not enough merely to prove that the tax as a whole was unlawful; some of the dollars he paid may nevertheless have been due. 70 F.2d at 620–21. In *Compton*, the Fourth Circuit confirmed that, in a refund action, the taxpayer does not satisfy his burden by showing merely that some refund is owed without proving the amount owed. *See* 334 F.2d at 216.

Nonetheless, Trigon argues that the burden is more relaxed. According to Trigon, the taxpayer has the burden of proving the overpayment of taxes, and, when the claim turns on a determination of value, the taxpayer need not prove that its proffered valuation is correct, but only that the correct refund amount is something higher than that advocated by the United States. In support of this contention, Trigon relies on two broad lines of authority: (1) cases generally following the rule of *Helvering v. Taylor*, 293 U.S. 507, 515–16, 55 S.Ct. 287, 79 L.Ed. 623 (1935) concerning the shifting burdens in deficiency cases; and (2) those cases following the rule of *Cohan v. Comm'r*, 39 F.2d 540, 544 (2d Cir.1930) concerning the relaxation of substantiation requirements for taxpayers claiming deductions. For the reasons that follow, neither line of authority applies to refund cases such as this one.

**B. The *Helvering v. Taylor* Exception Does Not Apply To Refund Cases**

█ In *Helvering v. Taylor*, the Supreme Court crafted a limited exception to the burden taxpayers bear in appeals of deficiency rulings. As with refund actions, the general rule in deficiency cases is that the taxpayer must show not only that the assessment was erroneous, but also the amount to which he is entitled. *See* 293 U.S. at 515, 55 S.Ct. 287. However, when the taxpayer succeeds in showing that the government's determination was "arbitrary and excessive," the taxpayer need not establish the correct amount the IRS should have charged in order to satisfy his burden. *See id.* at 515, 55 S.Ct. 287; *see also Cebollero v. Comm'r*, 967 F.2d 986, 990 (4th Cir.1992) (explaining the *Helvering* rule).

In the opinion of the Court of Appeals in *Taylor*, which the Supreme Court affirmed, Judge Hand explained the rationale for the relaxation of the taxpayer's burden in deficiency actions once the taxpayer proves that the government's determination was arbitrary and excessive: [8]

> [The reasoning supporting the more stringent burden in refund cases] does not apply when the proceeding is to review an assessment. Although that does indeed partake of the nature of a judgment, and the taxpayer has the burden of proving that it was wrong, after he has done so, he need not, at least under ordinary principles of procedure, prove that he owed not [sic] tax, or what was the tax that he did owe.... Any other result would invert the ordinary rules of procedure by imposing a burden of establishing a negative upon the obligor; indeed of disproving the existence of all possible obligations.

70 F.2d at 621. Stated somewhat differently, the taxpayer challenging the assessment of a deficiency should not be required to prove a negative, *i.e.*, that no tax is owed, or if any is owed, that no other obligations exist, whereas the taxpayer

---

8. In affirming the judgment of the Court of Appeals, the Supreme Court did not explain the rationale supporting the burden rules as completely as did Judge Hand, but nonetheless adopted Judge Hand's conclusions over the differing rules in other circuits.

seeking a refund of taxes paid reasonably can be expected to prove affirmatively the exact amount overpaid and why. *See generally,* Leo P. Martinez, Tax Collection and Populist Rhetoric, Shifting the Burden of Proof in Tax Cases, 39 Hastings L.J. 239 (1987) (explaining the derivation of the burden rules in different types of tax cases).

Trigon asserts that some expansive language in several decisions following *Helvering v. Taylor* extends the applicability of the exception beyond those deficiency cases where the taxpayer shows that the government's assessment was "arbitrary and excessive." [9] With but one exception, each of these decisions involved the same narrow factual situation that the Supreme Court faced in *Taylor*—i.e., the appeal of a deficiency action brought by the government. Trigon cites only one decision in which the *Helvering v. Taylor* exception has been applied in a refund action—*United States v. Hover,* 268 F.2d 657, 665 (9th Cir.1959)—and the Fourth Circuit has expressly recognized that *Hover* is an outlier not in accord with accepted precedent.

*See Compton,* 334 F.2d at 216 n. 10. Because this is an action for a refund, rather than a deficiency action, *Compton* controls and the *Helvering v. Taylor* exception does not apply.

## C. The *Cohan* Rule Does Not Apply Where There Is Insufficient Evidence To Support Estimation

■ Under *Cohan* and its progeny, a taxpayer claiming a deduction may overcome the presumptive correctness of the denial of the deduction by the IRS, even where the taxpayer has failed to show the exact amount of the deduction, so long as the evidence shows that the taxpayer is entitled to the deduction, and there is sufficient evidence in the record from which the Court may estimate the exact amount. In *Cohan,* the legendary entertainer George M. Cohan claimed certain business entertainment expenses as deductions, but had failed to keep records of these expenses, and therefore, could not establish the exact amount of the deduction. Even though Cohan had established that he did have some such expenses, and, therefore,

9. *See Wilson Coal Land Co. v. Comm'r,* 87 F.2d 185, 189 (4th Cir.1937) ("The presumption that the Commissioner's determination was correct was no longer conclusive when the taxpayer offered evidence tending to show that it rested upon a false foundation; and the Board was obliged to consider this evidence, even though the taxpayer failed to prove the correct amount of tax or to show that none was assessable."); *Clinton Cotton Mills v. Comm'r,* 78 F.2d 292, 295 (4th Cir.1935) ("Even if the Board were not disposed to accept the testimony of the witnesses as to the 1913 valuation in its entirety, it should certainly have determined that value in the light of this testimony and the other evidence in the case."); *B.F. Sturtevant Co. v. Comm'r,* 75 F.2d 316, 323–24 (1st Cir.1935) ("When the Board [of Tax Appeals] held that, because the petitioner did not prove what was the fair market value of the [assets] . . . to its satisfaction and the satisfaction of its accountant, the figure allowed by the Commissioner must stand, we think it erred as a matter of law."); *Guggenheim v. Helvering,* 117 F.2d 469, 474 (2d Cir.1941) ("And of all possible appraisals that alone was sure to be wrong which the Board chose; a doctrine so enamored of accuracy that it must abdicate is the most irrational of all. The law is not so helpless; situations again and again present themselves where, after all shifts are exhausted, rather than permit certain injustice, a tribunal will make the best reckoning that the facts admit though fully conscious of its infirmities."); *Comm'r v. Thompson,* 222 F.2d 893, 895 (3d Cir.1955) ("It is the function of the trier of fact to weigh all the elements properly considered in the valuation and to translate them into dollars and cents. If there is speculation in this, it is a product of the nature of the problem, but not a reason for abdicating the judicial function, which, in the administration of justice, is frequently called upon to appraise intangibles.")

was entitled to some deduction, the Commissioner disallowed the entire deduction, and the Board of Tax Appeals affirmed. The Second Circuit reversed, holding that, when the Tax Board acknowledged the legitimacy of a claimed deduction, the deduction could not be disallowed entirely merely because the taxpayer cannot prove an exact figure. Judge Learned Hand explained:

> Absolute certainty in such matters is usually impossible and is not necessary; the Board should make as close an approximation as it can, bearing heavily if it chooses upon the taxpayer whose inexactitude is of his own making. But to allow nothing at all appears to us inconsistent with saying that something was spent. True, we do not know how many trips Cohan made, nor how large his entertainments were; yet there was obviously some basis for computation, if necessary by drawing upon the Board's personal estimates of the minimum of such expenses. The amount may be trivial and unsatisfactory, but there was basis for some allowance, and it was wrong to refuse any, even though it were the traveling expenses of a single trip. It is not fatal that the result will inevitably be speculative; many important decisions must be such. We think that the Board was in error as to this and must reconsider the evidence.

39 F.2d at 543–44.

Courts continue to rely on the *Cohan* rule, albeit with some caution, to estimate the amount of a claimed deduction in cases where the taxpayer is unable to produce evidence substantiating the exact amount of a claimed deduction. *See e.g., Dunn v. Comm'r,* 301 F.3d 339, 358 (5th Cir.2002); *Ellis Banking Corp. v. Comm'r,* 688 F.2d 1376, 1383 (11th Cir.1982); *Levine v. Comm'r,* 324 F.2d 298, 302–03 (3d Cir. 1963); *Bryant v. Comm'r,* 76 F.2d 103, 105

(2d Cir.1935). Nevertheless, courts also have been reluctant to accept invitations to follow *Cohan* where a taxpayer fails to provide evidence that would permit an informed estimate of the amount of a deduction. *See e.g., Reinke v. Comm'r,* 46 F.3d 760, 764 (8th Cir.1995); *Rodman v. Comm'r,* 542 F.2d 845, 853–54 (2d Cir. 1976); *Coloman v. Comm'r,* 540 F.2d 427, 431–32 (9th Cir.1976).

For example, in *Coloman,* the Ninth Circuit explained the danger of liberal application of the *Cohan* rule. In that case, the taxpayer claimed a loss based on the depreciation of stock received in exchange for a partnership interest. The taxpayer, however, could not establish the basis of the stock with any credible evidence, so the Tax Court denied the deduction. On appeal, the taxpayer urged the Ninth Circuit to reverse the Tax Court for failing to apply the *Cohan* rule, but the Court declined: "In the instant case, to allow the Cohan doctrine to be invoked by the taxpayers would be in essence to condone the use of that doctrine as a substitute for burden of proof." 540 F.2d at 431–32.

For similar reasons, courts have declined to apply *Cohan* in cases where there is no doubt that the taxpayer incurred some deductible expense, but the taxpayer failed to present evidence sufficient to allow the court to make an accurate finding on the amount of the deduction. In *Williams v. United States,* 245 F.2d 559, 560 (5th Cir.1957), a corporation brought a refund suit claiming a deduction for expenses that its president had incurred in entertaining potential customers. The corporation's Board of Directors had given its president an allowance for such expenditures, and, in its refund suit, the corporation simply claimed the amount of that allowance as the amount of the deduction. Although the District Court held that the corporation "doubtless did have certain en-

tertainment and other expenses in 1950," it declined to estimate the amount of the deduction under *Cohan.* The Fifth Circuit affirmed, and explained that, although *Cohan* grants district courts the latitude to estimate in some circumstances, it "certainly does not require that such latitude be exercised." *Id.* Unless a district court has before it evidence sufficient to form a reasonable estimate, the Fifth Circuit explained, estimation under the *Cohan* rule "would be unguided largesse." *Id.; see also Norgaard v. Commissioner,* 939 F.2d 874, 879 (9th Cir.1991); *Vanicek v. Commissioner,* 85 T.C. 731, 742–43, 1985 WL 15409 (1985). Following this reasoning, triers of fact consistently have declined to follow *Cohan* where the evidence is insufficient to form the basis of a reasonable estimate. *See Maguire v. Comm'r,* 1996 WL 123146, 71 T.C.M. (CCH) 2535, T.C.M. (RIA) 96,145 (U.S.Tax Ct.1996); *Williams v. Commissioner,* 1994 WL 50462, 67 T.C.M. (CCH) 2185, T.C.M. (RIA) 94,063 (U.S.Tax Ct.1994) ("We stress that in order for this Court to apply the rationale of *Cohan v. Comm'r* ... to any particular disallowed expenditure, there must be sufficient evidence to permit us to make an estimation ... Self-serving, vague, and undocumented testimony is insufficient."); *Hyde v. Comm'r,* 1992 WL 174208, 64 T.C.M. (CCH) 265, T.C.M. (RIA) 92,419 (U.S.Tax Ct.1992); *Beam v. Comm'r,* 1990 WL 83346, 59 T.C.M. (CCH) 915, T.C.M. (P–H) 90,304 (U.S.Tax Ct.1990).

In this action, Trigon's argument that it was error not to apply *Cohan* and its progeny fails for similar reasons. First, although the August 9 Opinion generally accepted Trigon's legal theory, at no point did the opinion conclude that the subscriber and provider contracts actually had value on January 1, 1987. Trigon erroneously relies on the following language

in asserting that the August 9 Opinion held that the contracts in question had value on January 1, 1987:

> Trigon correctly argues that the cancellation or termination of a subscriber or provider contract is evidence of a closed and completed transaction and is an identifiable event within the meaning of Section 1.165–1(d)(1) of the regulations. Moreover, the cancellation or termination of a contract results in the sudden termination of its usefulness in Trigon's business and, therefore, satisfies the requirements for deductibility described in Section 1.165–2(a) of the Regulations.

215 F.Supp.2d at 703. Contrary to Trigon's argument, it does not necessarily follow, from the fact that the termination of a subscriber or provider contract is an identifiable event satisfying the requirements for deductibility, that Trigon's subscriber and provider contracts actually had value on January 1, 1987, or that the termination of such contracts between 1989 and 1995 actually resulted in a loss to Trigon.

Although some contracts likely had some value, the evidence in the record suggests that many of the contracts might well have been liabilities rather than assets. For example, the record shows that many contracts were unprofitable because of the effects of the competition between the Richmond and Roanoke plans and because of the sea change that was afoot in the health care industry at the valuation date.

Trigon further relies on the testimony of the United States' expert witness, Dr. Foster, in attempting to show that the subscriber contracts had value.[10] *See* Foster Tr. (11/16/02) 1242:13–21 (showing that application of the income method of valua-

---

**10.** Trigon makes no effort to show that the   provider contracts actually had value.

tion with different inputs resulted in an aggregate market value estimate of $130 million). Reliance on this testimony is likewise misplaced because Dr. Foster testified about the validity of the method that Trigon's expert used in valuing the contracts, not about the actual value of the contracts. The $130 million figure that Dr. Foster mentioned in testimony was not a valuation, but was offered to show the sensitivity of Wierwille's model to the inputs used to apply it. That Dr. Foster came up with a figure less than half as much as the figure advanced by Wierwille was simply one part of a large body of evidence indicating the unreliability of Wierwille's method. Accordingly, the $130 million figure does not prove that the contracts had some value as of January 1, 1987.

But, assuming that the contracts had some value as of January 1, 1987, the evidence simply was insufficient to permit any reasonably accurate quantification of that value. That is made clear by the August 9 Opinion. Even though the opinion held that the income approach was a suitable method for valuing assets such as the subscriber contracts in question here, the record shows that the income approach is highly dependent on the reliability of each of its three constituent elements, or "inputs," as has become the vernacular of this case. Those elements are: (1) projection of asset life; (2) projection of the income or cash flow to be received from the asset over its life; and (3) discounting the future income or cash flow back to its net present value on the valuation date. *See* 215 F.Supp.2d at 714–18. And, each of those three elements requires its own inputs, the reliability of which is critical to the reliability of the ultimate output—the valuation opinion. *Id.* at 726–39.

One consequence of these facts is that there is no reliable evidentiary predicate to use to fix the amount of a loss deduction for those contracts. As the August 9 Opinion makes clear, the inputs used by Trigon's expert were unreliable on each of the three elements, and several sub-elements, that comprise the income approach to valuation used to value the subscriber contracts. *See id.*

Likewise, there were fundamental defects respecting Wierwille's inputs to the cost approach that was used to value the provider contracts. *See id.* at 739–41. Consequently, like his valuation of the subscriber contracts, the valuation of the provider contracts was not reliable. In the absence of valuations based on reliable and accurate inputs, the Court simply lacks the evidence necessary to make a reasonable estimate of value.

In fact, on this record, the making of an estimation would be an exercise in sheer speculation. Unlike in *Cohan,* where the Tax Board was presumed to have personal knowledge of how to estimate expenses, the Court lacks the ability to manipulate the complex underlying data or to apply the complex underlying economic and mathematic models that are essential to valuation under either the income approach or the cost approach.

The sophisticated valuation techniques here can only be employed reliably by an expert in the field. That exercise is beyond the reach, and outside the province, of a district judge. Trigon has cited, and the Court has found, no decision applying the rule of *Cohan* to complex valuation cases such as this one. And, where, as here, the basic evidentiary predicate for valuation has been found wanting in so many ways, to do so would offend fundamental precepts respecting the nature and importance of the burden of proof.

## CONCLUSION

For the foregoing reasons, there is no basis either for amending the judgment

under Rule 59(e) or ordering a new trial limited to the issue of the appropriate measure of damages under Rule 59(a). Therefore, Trigon's motion is denied.

The Court is directed to send a copy of this Memorandum Opinion to all counsel of record.

It is so ORDERED.