ESTATE OF Virginia C. ANDREWS, Deceased, etc., Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 2:92cv97.

United States District Court, E.D. Virginia, Norfolk Division.

May 10, 1994.

Robert C. Nusbaum, Hofheimer, Nusbaum, McPhaul & Samuels, Philip R. Farthing, Payne, Gates, Farthing & Radd, P.C., Norfolk, VA, for plaintiffs.

George M. Kelley, III, Asst. U.S. Atty., Norfolk, VA, Harry J. Giacometti, Josh Eagle, Trial Attys., Tax Div., U.S. Dept. of Justice, Washington, DC, for defendant.

## MEMORANDUM ORDER AND OPINION

PAYNE, District Judge.

The Estate of Virginia C. Andrews (the "Estate") instituted this action to secure the refund of federal estate tax and interest in the amount of $947,483.87 which the Internal Revenue Service ("IRS") assessed on the value of the name of Virginia C. Andrews ("Andrews") who, at the time of her death on December 19, 1986, was an internationally known, best-selling author. The Estate timely filed its federal estate tax return on November 19, 1987 and therewith paid federal estate taxes in the amount of $2,057,784.50. The Estate did not list Andrews' name as among its assets and consequently none of the estate taxes it paid were based on the value of Andrews' name. On November 16, 1990, the IRS issued a notice of deficiency, asserting that the Andrews' name was an asset of the Estate having a value of $1,244,910.84 on the date of her death, and thereupon assessed deficient taxes in the amount of $649,201.77.

On March 7 and April 9, 1991, the Estate paid under protest the deficient tax and interest, a total of $947,483.87, and filed a claim for refund of that payment on July 25, 1991. The IRS took no action on the claim of refund within the ensuing six months and the Estate instituted this action on February 6, 1992. Following a bench trial and briefing, the case was submitted for decision.

## STATEMENT OF FACTS

The value of an author's name at date of death is an issue of first impression the resolution of which depends in substantial part on the facts known and reasonably knowable at the date of death. Those facts, as established by the preponderance of the evidence, are set forth below.

### 1. The General Background.

When V.C. Andrews died on December 19, 1986, she had achieved international recognition as an author of paperback fiction novels. Her literary career began with the publication of short stories and, as is usually the case, many of her early works met with rejection by publishers. However, in 1978, Andrews' career began its remarkable ascent upon the publication of "Flowers In The Attic" which achieved substantial commercial success and introduced a genre of literature which came to be known as "children in jeopardy" of which Andrews soon became the undisputed master.

Six more books of the same genre followed between 1979 and 1986: "Petals On The Wind" (1979); "If There Be Thorns" (1980); "Seeds Of Yesterday" (1981); "My Sweet Audrina" (1981); "Heaven" (1984); and "Dark Angel" (1986). Each was written in the first person and featured, as its principal character, a teenager, generally female, who was failed, and in some way hurt, by an adult family member with a warped personality. In each, the protagonist overcame the adversities visited upon her or him and, at the end of the novel, faced a hopeful future.

This genre of literature was particularly appealing to teenagers and young women. Soon that group became recognized as the principal market for Andrews' works. Each new novel enjoyed substantial commercial success, thereby enabling Andrews to command larger advances against royalties in succeeding contracts. For example, under the 1978 contract for "Flowers In The Attic," which had been rejected by seven publishers before being accepted by Pocket Books, a Simon & Schuster division, Andrews' advance was $7,500.00. Under the 1979 contract calling for two books, which became "Petals On The Wind" and "If There Be Thorns," Andrews' advance was $50,000.00. By 1980, the third contract called for an advance of $75,000.00. The 1981 contract provided for an advance of $1,500,000.00 for two books and the 1984 contract, which resulted in Andrews' last two books, "Heaven" and "Dark Angel," specified an advance of $2,000,000.00.

Andrews' literary efforts apart from the "children in jeopardy" genre did not meet with similar success. Under the terms of the 1979 contract, Andrews was to depart from that format and author a book tentatively entitled "The Obsessed." The success of, and the reaction to, "Flowers In The Attic," however, prompted the publisher and Andrews' agent, Anita Diamant, to suggest that "The Obsessed" not be published. Andrews, who by then had completed the manuscript for that book, agreed. Andrews also submitted to Pocket Books two other manuscripts entitled "Gods Of Green Mountain" and "All The Gallant Snowflakes" which deviated from the "children in jeopardy" genre. Both were rejected.

Thereafter, Pockets Books and Diamant urged Andrews to confine her creative efforts to the "children in jeopardy" genre. This is not surprising because, according to Diamant and Jack Romanos, President of Simon & Schuster's Consumer Group which includes Pocket Books, Andrews was the best-selling author in that genre. According to Romanos, only 50 other authors ever had achieved the level of sales achieved by Andrews. As Romanos put it in a memorandum to his staff on December 23, 1986 four days after Andrews' death: "She was one of those rare authors who brought millions of readers into the stores within weeks of each new release."

As is customary, the editorial process contributed to the author's success. According to Diamant and Romanos, that assistance was provided by Ann Patty, Andrews' editor at Pocket Books. In fact, Patty completed the editorial revisions for Andrews' last book, "Dark Angel," because Andrews was too ill to participate in the editorial process. Romanos testified that Patty's editorial contribution to Andrews' books was common knowledge in the publishing industry. Nonetheless, the record is clear that the principal reason for Andrews' success was her creative mind, her unique style of writing and her unique development of plot and character.

## 2. The Events of 1986.

"Dark Angel" was published in November 1986 and was an immediate commercial success. Pocket Books understandably was interested in further capitalizing on the commercial success of the "children in jeopardy" books. To this end, Pocket Books had initiated, earlier in 1986 before the publication of "Dark Angel," negotiations for another contract calling for Andrews to produce a sequel to "Dark Angel" in October 1987 and a prequel to "Flowers In The Attic" in October 1988. Diamant handled these negotiations for Andrews' company, Vanda Productions, Ltd. ("Vanda"). During the negotiations, which took place in October 1986, Diamant was unaware that Andrews was terminally ill. She only learned of Andrews' impending death after mailing the proposed contract to Andrews in early November. Diamant and Andrews never discussed the proposed contract.

The proposed contract was much like its predecessors in form and content. For instance, it too permitted the publisher to use Andrews' "name and likeness and biographical material about the writer for purposes of advertising and trade in connection with" Andrews' works. The proposed contract required Andrews' to produce two manuscripts and provided for $3 million in advances against royalties, and, like its predecessors, the proposed contract keyed payment of the greater part of the advances to the acceptance and publication of the manuscripts. The $3 million advance was the largest advance ever offered to Andrews. As was standard in all of the contracts between Andrews and Pocket Books, the proposed contract obligated Andrews personally (in the early contracts) or Vanda (after its formation) to repay the advances made before the publisher accepted the manuscript. Thereafter, the risk of failure shifted to Pocket Books which was permitted to recoup the advances only from the royalty payments generated by the sales of books published pursuant to the contract. Like the 1984 contract, the proposed contract contained an option clause under which the publisher was entitled to the first right of refusal on subsequent works of fiction submitted by Andrews.

Under circumstances and for reasons not disclosed by the record, Andrews signed the contract on behalf of Vanda on November 11,

1986. Diamant, however, did not receive the executed contract until after Andrews' death. Consequently, the publisher never executed the contract it had proposed for acceptance by Andrews.[1]

### 3. Andrews' Death And The Continued Publication Of Books Under Her Name.

Although Romanos knew that Andrews was too ill to complete the editorial process on "Dark Angel," neither he nor Diamant ever discussed the possibility of Andrews' death or the subject of using a ghostwriter to continue the "children in jeopardy" books. Nonetheless, on December 19, 1986, immediately after learning of Andrews' death from Ann Patty, Romanos expressed the view that it would be possible to continue publication of books in that genre under Andrews' name if another author could mimic Andrews' style.

Considering that ghostwritten novels were not unusual and that, at the time, "Dark Angel" occupied a high place on the national best-seller lists, the reaction of Romanos was not unexpected. In fact, Romanos was then of a mind to publish ghostwritten books under the terms of the contract which Andrews had executed before she died. Romanos, therefore, instructed Patty to raise the issue with the Andrews family during her trip to Virginia for the funeral, if an appropriate occasion for presentation of the topic should arise.

The topic of using a ghostwriter was not raised by Patty when she was in Virginia for the funeral. However, shortly thereafter, Diamant, who previously had been the agent for a ghostwriter of books known as the "Falconhurst" series, concluded that continued publication of ghostwritten "children in jeopardy" books was a realistic possibility. At the time, Diamant served as agent for Andrew Niederman, an obscure author of horror stories, and she considered him as a likely candidate to serve as ghostwriter.

After discussing the matter with Niederman, Diamant raised it with Charles E. Payne, one of the executors of the Estate, who received it unenthusiastically because he considered such a venture to be too speculative a matter on which to risk the Estate's capital. Moreover, Payne was fearful that an unsuccessful ghostwriting effort could have a serious adverse affect on sales of already published Andrews' books, thereby reducing the anticipated stream of royalty income to the Estate. Payne nevertheless discussed the proposed venture with the Andrews family which authorized Payne to determine whether such a project was feasible without placing substantial capital at risk.

While discussions about the ghostwriting project continued, the publisher commissioned Patty to ghostwrite a segment of the sequel to "Dark Angel." Patty's efforts were unsuccessful. Thereafter, Niederman, at the decision of Diamant and apparently with the approval of the publisher, embarked on a similar undertaking. He read all of Andrews' previous works, entered the texts of those works into a computer and analyzed Andrews' writing style and her plot, style and character development techniques. Niederman then produced an outline and several pages of ghostwritten text for the prequel to "Flowers In The Attic" which he submitted for review by Pocket Books.

On March 3, 1987, less than three months after Andrews' death Patty sent a letter to Diamant, with copies to Romanos and Payne, advising that:

> I received yesterday Andy's first chapter for the prequel to FLOWERS IN THE ATTIC. I am happy to say that we will be able to go ahead with him being the writer and I feel confident we can turn out a book that will resemble Virginia's.

Shortly thereafter, Payne and Romanos revised the proposed 1986 contract, which Andrews had executed before her death, to reflect that the project would proceed with a ghostwriter. Romanos executed it on behalf of Pocket Books late in March 1987. This contract will be referred to as the "First Publishing Contract."

---

**1.** It appears that Andrews began work on the first book immediately after signing the new proposed contract because, after her death, the family discovered approximately one hundred pages of manuscript in her residence. None of this text was used in the subsequent ghostwritten books.

At about the same time, Payne was negotiating a contract with Niederman ("Writer's Contract 1") which was executed on March 20, 1987. Paragraph 1 of Writer's Contract 1 provided, *inter alia*, that:

1. Owner [Vanda] and Writer [Niederman] acknowledge the following facts and representations giving rise to this agreement:

a. ... Owner believes that a substantial commercial market may exist for the prequel and the sequel, if another capable writer can write the two books for publication under the name of [Andrews], and in her style of writing....

Consistent with the objective of minimizing the risk to the Estate's capital, Writer's Contract 1 was keyed to the terms of the First Publishing Contract so that payments of advances from the publisher under it would constitute the sole source of the advances to be paid to Niederman. Paragraph 12, of Writer's Contract 1 provided that Andrews "shall be considered the author" of the works to be produced by Niederman and that Vanda would be entitled to register the copyrights on those works either in the name of Vanda or Andrews. Vanda also reserved the right unilaterally to determine whether Niederman would be permitted to proceed with the second book, the sequel to "Dark Angel."

All participants in the effort to continue the "children in jeopardy" genre recognized that ghostwriting was a difficult, and not always successful, venture. Payne, for example, considered the project to be so risky that he was unwilling to authorize it absent a structure that virtually eliminated exposure to the Estate for the substantial cost of sustaining it. Diamant knew that the venture was an uncertain one and, although she hoped that it would continue beyond the first book, she understood that the series likely would end if Niederman's first effort was not a commercial success. Romanos, who shared Payne's concern that an unsuccessful ghostwritten book could hurt future sales of pre-death books, explained that, if Niederman's first book had not met with success shortly after its release, it would have been withdrawn from the market and the publisher

would not have proceeded with the second book.

As it happened, all of these apprehensions were ill-founded. Within a week after it was released in October 1987, Niederman's first work, "Garden of Shadows," was pronounced a commercial success by Romanos. Indeed, there is evidence that, even before publication, the Estate and Pocket Books considered that Niederman's efforts would be successful because they undertook negotiations for a second contract (the "Second Publishing Contract"). This contract, which was executed on January 19, 1988, called for the Estate to provide three additional manuscripts for publication under Andrews' name.

Thereafter, Niederman undertook to write the sequel to "Dark Angel" and he and the Estate entered into a contract ("Writer's Contract 2") on April 18, 1988 for the three books called for by the Second Publishing Contract. On May 11, 1989, the Estate and the Publisher entered the Third Publishing Contract which required three additional novels in the Andrews style, but without use of any characters created by Andrews. By October 1990, Niederman had produced four more novels of the "children in jeopardy" genre.and in Andrews style: "Gates of Paradise" (1989); "Web of Dreams" (1990); "Dawn" (1990) and "Fallen Hearts" (1990).

While the central focus of the ghostwriting project was to mimic Andrews' style, plot construction and character development, there also were concerted efforts to maintain the illusion that Niederman's works were those of Andrews. Accordingly, the project proceeded on the fundamental premise that the works would bear only Andrews' name. Neither Payne, the executor, nor Romanos thought it advisable to have Niederman's name appear on the ghostwritten books. In fact, Writer's Contract 2 obligated Niederman not to disclose that he had written, or was writing, books "under the name of" Andrews. The succeeding writer's contracts contained the same restriction.

Moreover, although the fact of Andrews' death was the subject of newspaper obituaries, it was not until publication of the fifth ghostwritten book in 1990 that her death was confirmed to her audience in the preliminary

pages of "Dawn." Even then, the text of that notice led the reader to believe that the stories had been largely completed by Andrews before she died:

> When Virginia became seriously ill while writing the Casteel series, she began to work even harder, hoping to finish as many stories as possible so that her fans could one day share them. Just before she died we promised ourselves that we would take all of these wonderful stories and make them available to her readers.

Whatever may be said about the ethics of publishing this statement, the record establishes that its principal purpose was promotional and its text shows that Andrews' name was central to the promotional effort.

Romanos explained that the concealment of Niederman's identity was necessitated, in part, by a desire not to be irrevocably tied to Niederman's name or services particularly if his efforts were unsuccessful and, in part, by Niederman's own desire for anonymity so that he could pursue his own career under his own name. The record, however, is clear that the predominant reason for concealing Niederman's identity was that Andrews was the preeminent author in this unique genre and that books written by a well-known author have an enhanced chance of commercial success. For example, Diamant, an experienced literary agent, confirmed that Andrews' books sold well in substantial part because of her authorship. Romanos, an experienced publisher, expressed the view that, although the content of a book is the most important factor in its success, the name of the author is a significant factor in the commercial success of the book. Indeed, within a few days after Andrews' death, Romanos acknowledged that Andrews "was one of those rare authors who brought millions of readers into the stores within weeks of each new release." Eugene Andrews, one of the executors of the Estate agreed, when in a letter dated March 21, 1991 to Diamant respecting then ongoing negotiations with Niederman for a new writer contract, he observed:

> We cannot help what is true, *the books sell well because of the V.C. Andrews name.* The phenomenal success of her books, her rise from a tiny little Ant, to a Giant, in the literary world, was all her doing, and we cannot help that fact either.

> When my sister died, and Andy Niederman stepped into our life, we both had something to offer. He, with his wonderful talent, and we, *with a name that he could write under,* has made Andy a wealthy man.

(emphasis added). The other executor, Payne, expressed similar statements in a letter dated March 19, 1991 in furtherance of these negotiations then underway with Niederman:

> You should also recognize that the latest *royalty payment is down* off the recent levels by about 35%. This *follows closely* on the heels of the publicity *disclosing that the books are ghost-written. This suggests to me that people bought the earlier books you wrote because they thought Virginia wrote them* and Simon & Schuster merely edited them. It also suggests something about relative contributions to success.

(emphasis added). Payne then invited Niederman:

> . . . to compare the advances and royalties paid to you for books written for publication under your own name with the advances and royalties you have received for books written for us and published under the name "V.C. Andrews." I suspect that comparison would *demonstrate very clearly the value represented by the name "V.C. Andrews."*

(emphasis added).

As the executors observed, the marketplace had confirmed the value of Andrews' name upon publication of the first ghostwritten book. According to Romanos, the first ghostwritten book was available for purchase in mid-October 1987 and, within one week, Romanos pronounced it a commercial success. The Estate correctly points out that the publisher made substantial efforts to publicize the first ghostwritten book and now argues that the success of that book was attributable principally to that publicity. The argument, however, ignores the fact that the publicity heralded the forthcoming publication of a new "children in jeopardy" novel

authored by Andrews and that the publicity focused on the fact that the new work would be a prequel to "Flowers In The Attic," also authored by Andrews. The fact that the publicity traded heavily on Andrews' name and reputation augers in favor of a finding that there was substantial value in Andrews' name on the date of death.

The importance of Andrews' name in achieving such immediate, substantial commercial success of the first ghostwritten book is underscored by the fact that the high volume of sales occurred even though the reading public was not given the benefit of published critical reviews of the content of the book. This, of course, is not unusual in the paperback book market, but the fact that substantial sales were achieved without public discourse over the content of the ghostwritten book is significantly probative of the important role Andrews' name played in the commercial success of the first ghostwritten book.

The ensuing four books met with similar acceptance in the marketplace so that, by the time the IRS was finishing its audit in October 1990, Niederman had authored five ghostwritten books, all of which had enjoyed great commercial success.

### 4. The IRS Valuation.

With the foregoing information in mind, it is appropriate to review the determination of the IRS that the value of Andrews' name was $1,244,910.84 on the date of her death.

The IRS valuation was the work of Janna Levinstein, an IRS Estate Tax Examiner with fourteen years of experience in valuing decedents' estates for tax purposes. Most of Levinstein's experience was in valuing closely held corporations and, although she had not previously been called upon to value intellectual property rights or publishing contracts, she considered that the valuation techniques and principles she had used in valuing income streams from royalties and other intangible assets were useful in, if not directly applicable to, the valuation of Andrews' name and likeness. Levinstein's review of the Estate's tax return took place over a period of approximately two years from May 1988 to October 1990 interrupted by a four month

pregnancy leave during which time the file was transferred to another examiner who performed no work on it. The final judgment of the IRS was summarized as follows:

> The name, V.C. Andrews, and her likeness have measurable value based on the prior earnings of decedent and the contract signed by her shortly before her death. The value of the name and likeness were determined after valuing the potential novels that could be produced as written by her, deducting the amounts payable to the agent and amounts attributable to other factors involved in the production and marketing of the work, and discounting for the contingent nature of the work.

The value set by the IRS on Andrews' name was $1,244,910.04. The process which yielded that value was described by Levinstein at trial and in her two reports on the subject.

The starting point of the IRS valuation was the First Publishing Contract which Levinstein considered to be a ratification by the Estate of the contract signed on behalf of Vanda by Andrews in November 1986 approximately a month before her death. As explained previously, the First Publishing Contract provided for a $3 million advance for two books which were to be delivered for publication in 1987 and 1988 on a schedule set by the contract. The First Publishing Contract gave the publisher the right to use Andrews' name in advertising and otherwise promoting sales of the books. Levinstein correctly concluded that the publisher had set the amount of the advance payments in its original proposal to Andrews on the basis of what it expected to receive as minimum royalties from the prequel of "Flowers In The Attic" and the sequel to "Dark Angel."

Levinstein then interviewed Romanos and Diamant in September 1990, almost four years after Andrews' death. At that time, the two books called for by the First Publishing Contract had been published successfully. So too had three other post-death books authored by Niederman under the subsequent publishing contracts. Romanos informed Levinstein that he then thought the scope of the project would constitute those five books and three more yet to be published.

Levinstein interpreted the First Publishing Contract as allocating one half of the $3 million advance to each of the two books. The contract does not make that allocation; however, Levinstein's view is a legitimate interpretation of the schedule of payments and the Estate has not contested that aspect of the IRS valuation.

Levinstein then established a base value of $12 million for all post-death novels, published and to be published. The rationale which led to this figure was as follows:

> In order to establish a value for the rights to use Andrews' name we must *examine her success factor as of her death. At that time the publisher believed* from prior earnings history *that a novel written by her,* using *her name as author* and the genre novels she had developed, could generate enough sales to justify *royalty earnings to her of at least $1.5 million.* Therefore, *it* was willing to *advance that amount* for each of two projected novels.

> According to the publisher, the series generated by V.C. Andrews had *potential for six subsequent novels in addition to these two.* After that the serialization would have run their course. (emphasis added).

Levinstein then projected a value for all eight ghostwritten novels "... which would be enhanced by the V.C. Andrews name, reputation, and mystique ..." at the amount of $1.5 million each. This, according to Levinstein, would produce a "gross amount of $12 million."

The gross amount then was discounted by: (i) deducting 10% for the agent's commission; (ii) establishing a present value for the remaining balance by applying a 15% discount factor principally on the basis that it was the factor used by the Estate's appraiser to value the copyrights on novels written by Andrews; (iii) applying a uniform factor of 40% of net present value to account for the value of the work itself, marketing, promotions and advertising; and (iv) applying a discount for the contingency of the failure of the ghostwriter to produce a manuscript acceptable to the publisher, applying a higher discount factor to later novels on the theory that "success becomes less predictable the future in the future it occurs."

Applying this ·approach to each "set" of books (i.e., to the required output of each publishing contract entered into by the Estate), Levinstein valued the name and likeness of Andrews as: $621,218.07 for the first two post-death books; $391,702.30 for the next three post-death books; and $231,990.54 for the last three post-death books. This method yielded a total claimed date of death value for Andrews' name and likeness of $1,244,910.84.

The facts, as found in parts 1, 2 and 3 above, and Levinstein's valuation report delineated two disputes at the outset of this action. First, the Estate argued that Andrews' name and likeness should not be valued for estate tax purposes because it was not an asset of the Andrews' estate. Wisely, the Estate has foresworn that argument. Second, the Estate argued that Andrews' name and likeness, although assets of the Estate, had no measurable value. Neither the IRS nor the Estate have ascribed any value to Andrews' likeness and the record reflects that the dispute is over the value of the name, notwithstanding references in some of the documents to the "name and likeness" as the item to be valued.

The focus of the evidence at trial, therefore, was on the value of Andrews' name. The IRS, supported by Levinstein's original report and her expert testimony, continued in its assertion that the value of Andrews' name was $1,244,910.04.

### 5. The Expert Testimony Of Peter Jaszi Offered By The IRS.

The IRS also offered the testimony of Peter Jaszi, an expert in intellectual property law, to support the testimony of Levinstein and the IRS valuation. According to Jaszi, the effect of the First Publishing Contract was to confer a package of rights on the publisher which were essential to the ghostwritten continuation of the Andrews' "children in jeopardy" line of literature with which Andrews' name was uniquely associated. That bundle of rights consisted of: (1) the Estate's copyright interests; (2) the Estate's interests in Andrews' persona, *i.e.,* her name and likeness; and (3) the Estate's right

to use the ghostwritten material to which it owned the copyrights. According to Jaszi, each factor should be, and usually is, assigned equal weight absent evidence that one or more factors should be ascribed a different weight. Jaszi's detailed examination of all three components and the testimony presented in the depositions and offered by the Estate at trial led him to conclude that it would be speculative to attribute other than equal weight to each component because there was no clear evidence to support any other allocation.

Recognizing that the value of Andrews' name must be determined at date of death, Jaszi concluded that the best evidence of the Estate's rights was "the final contract which Pocket Books had offered to Andrews, for two books which would complete the Dollanganger series, and continue the Casteel series, respectively." The advance figures of $1.5 million for each novel, in Jaszi's view, "offered the best available basis for estimating the value of additional novels in the 'V.C. Andrews' line.'"

### 6. The Estate's Evidence On Valuation.

The expert evidence about valuation presented by the Estate was offered by Philip W. Moore, President of Seligman Valuations. Moore had extensive experience in valuing closely-held corporations and securities as well as various investments and other tangible and intangible assets. Like Levinstein, Moore had no previous experience in valuing an author's name, but he had been involved in valuing the name of a deceased famous designer of men's clothes. Moore applied what he described as generally accepted valuation techniques in conducting a study of the publishing industry, the market for Andrews' books, the general economic conditions extant in late 1986 and early 1987, and the investment market generally in the same timeframe. Using this general information as background, Moore then expressed an opinion about the facts which would be considered by the buyer and seller in the hypothetical transaction required by the IRS regulations and the decisional law. Having done that and mindful of the evidence offered at trial respecting facts reasonably knowable on the date of death, Moore opined that on the date of Andrews' death a willing buyer and seller, neither acting under compulsion and both being informed as to the reasonably knowable facts, would have arrived at a price of $140,000 in a hypothetical sale and purchase of Andrews' name.

Mr. Moore posited that the investment opportunity for the buyer was an unattractive one because: (1) it was fraught with uncertainties; (2) it presented a risk that there would be no return on the investment; and (3) there were other more attractive alternatives. Accordingly, it was Moore's opinion that the buyer would discount by 85% the price that otherwise would be required to purchase the name.

Moore also opined that the maximum possible return on the investment was "the $1.5 million of the October, 1986 writing contract's potential total advances on royalties for the first book." He reduced that figure by $500,000 to account for expenses necessary to produce even the possibility of a return on the investment (e.g., agent, $150,000; writer, $250,000; lawyer, $67,000; accountants, travel and incidentals, $32,500). Thus, according to Moore, the maximum pretax return on the investment would be $1 million which should be discounted by the 85% risk factor. Under this method, the "fair market value" for the use of Andrews' name would be $150,000 ($1 million multiplied by 15%). In Moore's view, the buyer would begin negotiations by offering to pay $135,000 and the Estate, which itself would have made a similar evaluation of facts, would have asked $150,000, but would have settled for a price of $140,000 after further negotiation. Thereupon, Moore concluded that "the fair market value for the sale of the use of the V.C. Andrews name as of December 19, 1986 was $140,000...."

### DISCUSSION

The basic principles of law which govern valuation of property in a decedent's estate are well-settled. First, the controlling statute, 26 U.S.C. § 2031(a), provides that:

> The value of the gross estate of the decedent shall be determined by including ... the value at the time of his death of all

property, real or personal, tangible or intangible, wherever situated.

The regulations which implement this statute, and hence have the force of law, specify that the value of every item to be taxed is its "fair market value at the time of decedent's death."[2] The regulations further provide that: "[t]he fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of the relevant facts." 26 C.F.R. § 20.2031-1(b).

■■■ The decisional law has defined the "relevant facts" for purposes of setting value on the date of death to be those that the hypothetical willing buyer and seller "could reasonably have been expected to know at that time." *First Nat. Bank of Kenosha v. United States*, 763 F.2d 891, 893–94 (7th Cir.1985). This has spawned the related rule that "... subsequent events are not considered in fixing fair market value, except to the extent that they were reasonably foreseeable at the date of valuation—in estate tax cases, the date of death." *Id.* at 894 (citations omitted). That rule is, in turn, modified by the principle that "[s]ubsequent events may serve to establish both that the expectations were entertained and also that such expectations were reasonable and intelligent." *Estate of Jephson v. Commissioner of Internal Revenue*, 81 T.C. 999, 1983 WL 14908 (1983). To that extent then, events which occur after the date of death may be taken into account in making the valuation decision. When considered together, these principles governing consideration of events occurring subsequent to death have become a rule of relevance which precludes, as irrelevant, information that the hypothetical willing buyer could not have known and permits, as relevant, evidence of the actual price received after the date of death "so long as the sale occurred within a reasonable time after death and no intervening events drastically changed the value of the property." *First Nat. Bank of Kenosha, supra.*

■■ The applicable regulations also teach that the relevant market to be considered in determining the fair market value of an asset is the market in which that asset is usually and commonly the subject of commerce. 26 C.F.R. § 20.2031-1(b). In that regard: "[a]ll relevant facts and elements of value as of the applicable valuation date shall be considered in every case." This requires that each case be judged on its own facts, taking into account the nature of the asset and the market in which its monetary value ordinarily would be set, "subject to such uncertainty as ordinarily attaches to such an inquiry." *See, e.g., Estate of Vardell v. Commissioner of Internal Revenue*, 307 F.2d 688, 693 (5th Cir. 1962).

■■ Finally, as a procedural point of departure, it is settled that, in an action for refund, the determination of the IRS enjoys a presumption of correctness, which the taxpayer must overcome by showing that no tax at all is owed or that the amount of tax owed is in a lesser amount than that determined by the IRS. *Compton v. United States*, 334 F.2d 212, 216 (4th Cir.1964). This presumption exists because a suit for refund is in the nature of an action of assumpsit for money had and received, *Lewis v. Reynolds*, 284 U.S. 281, 283, 52 S.Ct. 145, 146, 76 L.Ed. 293 (1932), in which it is the taxpayer's burden to establish by a preponderance of the evidence that the taxes sought to be refunded were in fact overpaid. *Id.*

## A. The Facts Reasonably Knowable To The Hypothetical Buyer and Seller.

The starting point for the analysis required by these legal principles is to determine the facts reasonably knowable on December 19, 1986 to the parties to the hypothetical sale transaction. The record shows that those parties would have had access to much information of significance.

For instance, the parties to the transaction would have known that Andrews was a best-selling author whose name was internationally recognized as the preeminent author of

2. As an alternative, the executor may elect to set value six months after death. 26 U.S.C.

§ 2032(a). That alternative is not at issue here.

"children in jeopardy" books; and that Andrews' books, although not written to a formula, contained similar themes and similar kinds of characters and in many other ways bore the distinctive imprint of Andrews' unique style. Informed buyers and sellers also would have known that no other author had approximated Andrews' success in this rather unique genre of literature. And, it would be known to both buyer and seller that Andrews' most recent book was still high on the national best-seller lists.

The relevant market would have been in the publishing industry. The parties to the hypothetical sale transaction would therefore be expected to know the role of a famous author's name in commerce within the publishing industry. In that regard, they would understand, as Diamant and Romanos made clear, that the author's name is instrumental in promoting the sales of books particularly where, as here, there exists a well-defined readership audience as the consequence of seven previous best-selling novels.

Knowledge of the relevant market also would have made the hypothetical parties aware that the content of a book is another key element in its commercial success. They also would know, however, that Andrews' books were published in the paperback segment of the market and therefore they would understand that publication of Andrews' books would not be preceded by, or attended with, critical reviews of the work because that practice is confined generally to that segment of the market for publication of hardcover books. Considering this factor, the parties would perceive that the commercial success of a new book in the "children in jeopardy genre" would be heavily dependent upon association with the name of an author whose similar works were well-accepted by an extensive and faithful audience.

On the other hand, the hypothetical buyer and seller would fully appreciate that a poorly received book bearing Andrews' name could have an adverse impact on the sales of the books she wrote before her death. Both parties would recognize that the economic consequences to the Estate would be a diminished stream of royalty income from the pre-death books.

Because the parties would be familiar with the publishing industry, they would know that the continuation of related books or of books in series, by use of ghostwriters following an author's death is not an uncommon practice. For example, the Hardy Boys, Nancy Drew and Bobbsey Twins books were successfully ghostwritten. More analogous to Andrews' work, the Falconhurst series was ghostwritten and successfully published for years after the author's death. It is correct, as the Estate contends, that there is no ghostwritten series which is directly analogous to Andrews' works. However, the seven best-sellers authored by Andrews had established two different series, one involving the Dollanganger family and the other involving the Casteel family, both of which were amenable to further development as is evidenced by the First Publishing Contract which contemplated one further book involving each family. Moreover, Romanos thought of continuing to publish new books under Andrews' name with a ghostwriter as soon as he had learned, on December 19, 1986, that Andrews' had died. A very short time thereafter Diamant settled upon the same idea. Hence, this record establishes that a knowledgeable buyer and seller reasonably would have known that continuation of Andrews' works by use of a ghostwriter was a realistic possibility.

The parties to the hypothetical sale could reasonably have been expected to make themselves aware of previous contractual arrangements between Andrews and her publisher. Therefore, they would have known that previous contracts permitted the publisher to use Andrews' name and likeness to promote books written pursuant to the previous contracts, and that all previous rights to the use of Andrews' name had been in association with the production or promotion of a literary work. For these reasons and because of the other provisions of the previous contracts, the parties to the hypothetical transaction would expect that use of the name likely would be linked with acceptance

of a manuscript which, of course, would have to be ghostwritten.[3]

Any party to a transaction involving the right to use Andrews' name in conjunction with a ghostwritten manuscript would have appreciated, as did the executor, the publisher and the agent, that there was no assurance that a ghostwriter would be able to produce a manuscript acceptable to the publisher. Hence, the parties would know that purchase of the right to use Andrews' name in conjunction with a ghostwritten book would entail the risk that the purchase transaction might be for naught. On the other hand, both parties would appreciate that there was the prospect of substantial commercial success if a ghostwriter could mimic Andrews' unique style.

Without doubt, a willing buyer would be aware of alternative investment opportunities for the capital that would be required to purchase Andrews' name. Given the uncertainty of locating a suitable ghostwriter and of securing the publisher's approval of a ghostwritten manuscript, the buyer would be required to consider that the investment capital could be committed for a year or more. The record shows that in December 1986 the buyer could have concluded that the equity securities markets presented a reasonably attractive investment alternative for the ensuing year,[4] while the bond markets appeared considerably less attractive. And, there were signals of serious, basic and widespread difficulties in the real estate market which would have warranted caution in selecting real estate as an alternative vehicle for investment.

Taken as a whole, the record shows that the principal obstacle to, and risk associated with the purchase of Andrews' name was presented by the significant uncertainty attendant upon the production of a ghostwritten manuscript acceptable to a publisher. That, as the record establishes, was a significant risk which, in turn, would motivate the buyer to discount the purchase price sub-

stantially. In fact, both the IRS and the Estate acknowledge that a buyer would significantly discount the purchase price for the risk of failure to produce an acceptable manuscript.

The IRS valuation assigned a risk of failure discount of 33% to the two books required by the First Publishing Contract, a 45% risk of failure discount to the three books required by the Second Publishing Contract and a 50% risk of failure discount to the three books required by the Third Publishing Contract. The Estate's expert in valuation, Phillip Moore, opined that the willing buyer would assign an 85% risk of failure discount to the investment of capital used to purchase Andrews' name. Although the IRS and the Estate differ greatly as to the amount of the risk, both recognize that the risk associated with the purchase of Andrews' name would have been significant.

Hence, it appears that a willing buyer and seller, neither acting under compulsion, and both having taken advantage of information reasonably available on December 19, 1986, would have taken into account that: (i) there was little, if any, market for Andrews' name unless it was associated with a book the sales of which could have produced a return on the investment required to purchase the right to use the name; (ii) there was no realistic possibility of securing a return on the investment unless a ghostwriter could produce a manuscript acceptable to a publisher; (iii) there was a significant risk that such a manuscript could not be produced; (iv) there was a great likelihood that, if the first ghostwritten book were unsuccessful, its distribution would be stopped and remaining published copies would be pulled from the shelves and that there would be no further ghostwritten books published; (v) there was a risk that a poorly received ghostwritten book would reduce the royalty income stream to the Estate from sales of pre-death books; (vi) there existed the possibility of substantial financial gain if the first ghostwritten book

---

**3.** Even if the actual contracts were not available to both parties to the transaction, both would be expected to become familiar with contracting practices within the publishing industry and thus would understand these factors because the contracts between Andrews and Pocket Books were fairly typical of publishing contracts generally.

**4.** Of course, with the benefit of hindsight, we know now that 1987 was a particularly unattractive alternative.

was a commercial success and if the ghostwriter could successfully produce other similar books, but that it was virtually impossible to predict the likelihood that future ghostwritten books would be commercially successful, even if the first book achieved such success; (vii) there existed a substantial risk that the investment could yield no return at all; and (viii) there were several alternative investments that presented substantially less risk than investing in the purchase of Andrews' name.

### B. The Hypothetical Sales Transaction.

Having ascertained the relevant facts reasonably knowable to the hypothetical seller and buyer of Andrews' name on the date of her death, it is necessary now to consider how those facts would have been applied to the negotiation of the price at which the seller would have parted with, and a buyer would have acquired, the rights to the use of Andrews' name.

Although the IRS valuation listed the controlling regulations and some of the decisions which require valuation under the hypothetical transaction scenario, the text of the valuation takes no significant cognizance of the willing buyer and seller scenario prescribed by IRS regulations and the applicable decisional law as the method for determining the value of an asset on the date of death. Accordingly, the IRS valuation is of limited use in assessing what impact the reasonably knowable facts would have had on the hypothetical transaction required by the IRS regulations and the applicable law.

As explained previously, Mr. Moore arrived at a value of $140,000 using the hypothetical buyer and seller scenario required by the controlling IRS regulations and the applicable decisions. Moore presented as background for his opinion an impressive study of the publishing industry at the end of 1986, the general investment alternatives available in 1986, the economic conditions at that time which are relevant to any assessment of investment alternatives, and the nature of, and the market for, Andrews' unique works of literature. His study confirms that, although at the end of 1986 Andrews' name was im-

bued with substantial value if associated with an acceptable manuscript, the practical economic considerations knowable to the hypothetical buyer and seller and the risk inherent in a successful ghostwriting project, made commerce in Andrews' name a somewhat speculative investment. In so doing, Moore's evidence is fully consistent with that presented by Romanos, Diamant and the executor all of whom considered the ghostwriting project to be a somewhat speculative venture, but one which, if achieved, would be capable of substantial commercial success.

Both the IRS and the Estate have used the First Publishing Contract, albeit in different ways, as the principal point of departure in valuing Andrews' name. The First Publishing Contract may appropriately be considered in determining the value of Andrews' name because its existence and the possibilities it presented were reasonably knowable on the date of death to the buyer and seller in the hypothetical transaction which forms the framework for valuing Andrews' name. The First Publishing Contract reflects the basic economic terms to which Andrews, on behalf of Vanda, agreed several weeks before her death. Of course, the publisher had not executed the First Publishing Contract on the date of death; however, the contract signed by Andrews in November 1986, with only minor changes necessitated by the fact of Andrews' death, became the First Publishing Contract which the Estate and the publisher executed in March 1987. Accordingly, it is peculiarly instructive to a buyer and seller respecting the economic parameters sought to be established in the hypothetical negotiation required by the IRS regulations. This is in keeping with the now accepted principle that contracts for the sale of assets made after, but reasonably near, the date of death are persuasive evidence of fair market value except where a material change in circumstances between the date of sale and the date of death operates to render the sale unforeseeable on the date of death. *Estate of Love v. Commissioner,* 57 T.C.M. 1989–470 (CCH), 1989 WL 99436 aff'd. 923 F.2d 335 (4th Cir.1991).

█ The Estate argues that the First Publishing Contract cannot be considered be-

cause it was a post-death event, having been executed after Andrews' death. This, however, ignores the fact that the economic terms of the contract as well as its basic conditions had been the subject of negotiation between Andrews' agent and the publisher and had been agreed to by Andrews before her death. These facts would have been known to, or reasonably knowable by, the parties to the hypothetical date of death sale.

The Estate also argues that Andrews' death was a post-death event the occurrence of which constituted a changed circumstance making the First Publishing Contract between the Estate and the publisher unforeseeable. This argument is a non-sequitur because death cannot constitute a changed circumstance within the meaning of the rule in *Love*. The text of *Love* makes clear that the intervening event must occur between the date of death and the date of the sale to be a changed circumstance. Hence, death, which establishes the first benchmark date in the *Love* rule, could not qualify under *Love* as a changed circumstance. But, even if logic and *Love* would permit that argument on other facts, it would be unavailing here because the real issue is whether the intervening event—death—made execution of the First Publishing Contract unforeseeable on the date of death. On this record, it did not because the only commercial use of the name possible was in association with a ghostwritten manuscript and that, as is evidenced by Romanos' testimony, was foreseeable on the date of death.

The IRS also used the Second and Third Publishing Contracts, each of which called for three books, in arriving at its valuation because the IRS determined that the First, Second and Third Publishing Contracts, requiring the production of eight books, all were foreseeable on the date of death. According to the IRS posttrial brief, the IRS' "projection of eight post-death books, used as the foundation for valuing the 'V.C. Andrews' name was taken from the potential expressed to Levinstein [the IRS examiner] by Romanos and Diamant in a conference on September 19, 1990, and not based on actual books written after Andrews' death."

The record does not support reliance on the Second and Third Publishing Contracts in any way. To the contrary, the record establishes that, although Romanos, Diamant and the Estate, were hopeful that the ghostwriting venture would succeed, all considered the venture to be risky and speculative. Romanos and Diamant unequivocally stated that, if the first ghostwritten book failed, there would be no more published. Romanos also explained that, if the first book failed, it would be pulled from the shelves to avoid damage to market for pre-death books.

Moreover, it would not be reasonable to expect on December 19, 1986 that numerous other successful books would follow the two books contemplated by the First Publishing Contract even if the first ghostwritten book was successful. To hold that such an expectation was reasonable would mean: first, that it was reasonable to believe that a ghostwriter could satisfy the publisher as to the first book; second, that the first book would be a commercial success; third, that the manuscripts tendered for the subsequent books would satisfy a publisher; and, finally, that the subsequent books also would be commercially successful. On this record, there is no basis to support a finding that such expectations reasonably could have been held on December 19, 1986 by an informed buyer or seller. In fact, the IRS valuation considers the risk of failure associated with subsequent books to be materially greater than the risk associated with the first book. Thus, the record establishes that the project was sufficiently risky that an informed buyer and seller would have been negotiating on the basis that neither of them could expect numerous subsequent books which would produce income of such magnitude as to warrant increasing the price at which the hypothetical sale of Andrews' name would be made in December 1986.

The determination that the First Publishing Contract may be used in determining the value of Andrews' name on this date of her death does not, however, itself result in establishing the value of Andrews' name because the right to use the name is only part of a bundle of rights made subject

to commerce and the contract does not allocate specific value to the name or to the other subjects of the contract.

Considering that the hypothetical buyer and seller would have known that an unsuccessful first ghostwritten book would have been removed from the shelves and a second one would not have been attempted, it is reasonable to assume that they would have taken that into account in assessing how the terms of the First Publishing Contract should be considered in arriving at a price for the sale of Andrews' name. Under these facts, both buyer and seller would have been compelled to conclude that success or failure of the investment represented by the purchase price would depend upon acceptance of the first book by the publisher. This, in turn would permit the hypothetical parties to consider the advances against the first book as a device useful to them in measuring the value of Andrews' name because the advances against the first book presented the only assured return on an investment once the ghostwritten manuscript was accepted for publication.

Likewise, both buyer and seller would know that earlier contracts had provided for advances which had increased dramatically with the success of each succeeding book. By combining this readily available information, they would conclude that all or part of the advance for the first book was a good starting point for valuing the asset to be purchased in the hypothetical sale.

As explained previously, the First Publishing Contract does not allocate any segment of the consideration to the right to use the name which is clearly among the consideration flowing to the publisher under the contract. Of the total advance of $3 million, $1,550,000 is attributable to the first book ($500,000 upon execution of the contract; $200,000 on acceptance of the first half of the manuscript; $350,000 on acceptance of the second half of the manuscript; $500,000 sixty days after publication).

Moore, Jaszi and Levinstein all use $1,500,000 as either the starting point or a principal focal point of their approach to valuing Andrews' name at the date of death. In fact, it is the common denominator in the otherwise substantially different approaches taken by the experts in valuing Andrews' name. And, that amount is a focal point of their respective opinions. The soundness of using the amount advanced for the first book under the First Publishing Contract as a benchmark for valuing Andrews' name is confirmed by other evidence in the record, such as the correlation between the success of past books and the size of advances in ensuing contracts and the fact that the author has no personal obligation to repay advances after each payment benchmark is reached. It receives further confirmation from the fact that no expert sought to determine value by predicting the amount of royalty revenue from the first ghostwritten books and, of course, this is the only other reasonably available source of revenue from the use of the name.[5] For the foregoing reasons, the court concludes that the hypothetical buyer and seller would start their respective determinations of the price component at $1.55 million, the advance for the first book under the First Publishing Contract.

Moore testified, and common sense confirms, that the parties to the transaction would realize that the expense of producing the literary product would have to be taken into account in setting the value. Neither Levinstein nor Jaszi disagreed with this logical proposition. Nor does the post-trial brief of the IRS dispute it. The only specific evidence on this subject comes from Moore who testified that expenses would be approximately $500,000.[6] On this record, Moore's estimate of expenses is a reasonable one.

---

5. No witness testified that income from the sale or distribution of motion picture or television versions of ghostwritten books should be considered in the valuation calculus.

6. Moore projected: $150,000 for the agent's fee (the record supports an agent's fee of 10%); $250,000 for the ghostwriter (that was the amount of the First Writer's Contract and it does

not seem unreasonable that slightly more than 15% of the advance would be required to secure a ghostwriter). However, Moore also projected legal fees of $76,500 and $32,500 for accountants' fees, travel and incidentals. Nothing in his report or the record directly supports the amount attributed to Moore for those components, but there is no evidence to contradict those figures.

Both Moore and Levinstein agreed that it was necessary to apply a discount to allow for the risky nature of the project. Moore used a risk factor of 85%. Levinstein used a "contingency factor" of 33% for the risk associated with the venture in producing the first book.[7]

Levinstein concluded that there was a greater prospect for success of the first ghostwritten books than for later ones. For this reason, she applied a lower risk factor discount of 33% for the first such book. Although subsequent developments proved that Levinstein was in error as to the later books, that evidence cannot be considered.[8] However, Levinstein's conclusion respecting the prospects for the first ghostwritten book is borne out by the fact that Andrews' name was associated with a unique genre of literature for which there was an existing, highly loyal and expanding readership as is evidenced by the rapid growth in sales of books actually written by Andrews. It is underscored by the fact that Andrews' last predeath book was high on the national bestseller lists at the time she died. It is confirmed by the immediate judgment of Romanos to undertake ghostwritten sequels to the same books for which the original 1986 was proposed upon essentially the same contract terms.

Taken as a whole, the record does not support Moore's use of an 85% discount factor, notwithstanding that his report posits a plausible explanation for his opinion that this figure should be used. The 85% discount factor does not properly allow for the strong market for Andrews' works on the date of her death, as evidenced by the prominent place on the best-seller lists held in December 1986 by "Dawn." Nor does it properly recognize the extremely unique nature of Andrews' past success and the scope of her renown in this highly unusual genre of literature which enjoyed a ready-made market in which, as Romanos acknowledged to his staff

a few days after Andrews' death, significant sales were generated simply by virtue of the fact that Andrews was the author.

To be sure, the quality of the literary work was a key element in the volume of sales, but it does too little credit to the undisputed evidence of Andrews' popularity and achievement to say that the prospect of finding a ghostwriter who could satisfy the publisher with a manuscript was so risky as to warrant an 85% discount factor. Moreover, the use of the 85% risk factor does not properly reflect the extent to which ghostwriters had succeeded in generating manuscripts acceptable to publishers.

Considering the success of other ghostwriting ventures and the immense popularity of Andrews' name and the substantial size of her very loyal established audience, the court finds that a 33% discount factor would have been appropriate to use in arriving at the price for the hypothetical transaction here at issue. Applying the mathematical method used by both Moore and Levinstein to these findings, the valuation of Andrews' name at date of death would be $703,500.

For the foregoing reasons, the court finds that the Estate has overcome the presumption of correctness enjoyed by the original IRS determination of the value of Andrews' name and has established by a preponderance of the evidence that the tax assessed by the IRS on the value of Andrews' name was not correct. Taken as a whole, the evidence establishes that Andrews' name was an asset of the Estate which, on the date of Andrews' death, had a value in the amount of $703,500. Within fifteen days, the parties shall submit an agreed statement of the amount of the taxes owed, and the refund due, as a consequence of this decision.

The Estate has asserted a claim for attorney's fees. If, after consideration of the opinion, the Estate remains of the view that it is entitled to attorney's fees, it shall submit

---

Moreover, Levinstein applied a 40% "other factor" to account for expenses associated with producing the literary product. This is substantially greater than the expense component used by Moore.

7. Of course, Levinstein applied her risk discount to the present value of $3 million which was the advances for both books under the First Publishing Contract reduced by the 40% "other factors" discount.

8. See p. 1289, *supra*.

thirty days after entry of this Memorandum Opinion and Order, a petition for attorney's fees with supporting evidence and brief. The IRS shall submit its response thirty days thereafter. The Estate shall submit its reply brief, if any, ten days thereafter. Counsel shall arrange oral argument, if desired.

 The Estate seeks abatement of interest under 26 U.S.C. § 6404(e)(1) which provides:

In the case of any assessment of interest on—

(A) any deficiency attributable in whole or in part to an error or delay by an officer or employee of the Internal Revenue Service (acting in his official capacity) in performing a ministerial act, or

(B) any payment of any tax described in section 6212(a) to the extent that any delay in such payment is attributable to such an officer or employee being dilatory in performing a ministerial act,

the Secretary may abate the assessment of all or any part of such interest for any period. For purposes of the preceding sentence, an error or delay shall be taken into account only if no significant aspect of such error or delay can be attributed to the taxpayer involved, and after the Internal Revenue Service has contacted the taxpayer in writing with respect to such deficiency or payment. (emphasis supplied).

By its terms, the statute vests discretion in the IRS to abate interest if the statutory requisites for that relief are determined to exist. *Selman v. United States,* 941 F.2d 1060, 1064 (10th Cir.1991); *Brahms v. United States,* 18 Cl.Ct. 471, 475 (1989). The Estate cites no authority which would permit this court to review the exercise of that discretion. Other cases have held that the discretion is not subject to judicial review. *Selman v. United States,* 941 F.2d at 1063–64; *Brahms v. United States,* 18 Cl.Ct. at 475; *Horton Homes, Inc. v. United States,* 936 F.2d 548, 554 (11th Cir.1991). The text of the statute, its legislative history and au-

thoritative decisions interpreting it all preclude judicial examination of this issue.

It is so ORDERED.